[No. B078462. Second Dist., Div. Four. Feb. 15, 1995.]

In re EXECUTIVE LIFE INSURANCE COMPANY in Conservation of Assets.
CHARLES QUACKENBUSH, as Insurance Commissioner, etc., Plaintiff and Respondent, v.
AURORA NATIONAL LIFE ASSURANCE COMPANY et al., Defendants and Respondents;
COMMERCIAL NATIONAL BANK IN SHREVERPORT et al., Defendants and Appellants.

## COUNSEL

Pillsbury Madison & Sutro, Philip S. Warden, John W. Grenfell, Kevin M. Fong, Mark Schallert, Robert L. Wallan, Maureen C. Dellinger, Thelen, Marrin, Johnson & Bridges, Gary L. Fontana, Jonathan E. Polonsky, Christine C. Franklin, Valarie H. Macht, Thomas P. Higgins, Haight, Brown & Bonesteel, Roy G. Weatherup and Jon M. Kasimov for Defendants and Appellants.

Weinberg & Green, Charles O. Monk II, Arthur F. Fergenson, Sherry H. Flax, Matthew G. Dobson, Fried, Frank, Harris, Shriver & Jacobson, Jed S. Rakoff, Howard W. Goldstein, Stephen D. Alexander, Manatt, Phelps & Phillips, Robert E. Hinerfeld as Amici Curiae on behalf of Defendants and Appellants.

Daniel E. Lungren, Attorney General, Edmond B. Mamer, Deputy Attorney General, Janice E. Kerr, Lorraine Johnson, Howard Rice, Nemerovski,

Canady, Robertson, Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer, Peter J. Busch, Laurence F. Pulgram, Rubinstein & Perry, Karl L. Rubinstein and Dana Carli Brooks for Plaintiff and Respondent.

Pachulski, Stang, Ziehl & Young, Larry W. Gabriel, Iain A. W. Nasatir, McNitt, Edwards & Schraner, Roger L. McNitt, Andrew G. Loeb, Kenneth A. Zak, Brobeck, Phleger & Harrison, Kent M. Roger, G. Larry Engel, Esther H. Pang, David M. Higgins, Lillick & Charles, Stephen Oroza, John M. Rosenthal, Daar & Newman, Jeffery J. Daar, Rodney W. Loeb, Irell & Manella, Peter J. Gregora, Kenneth R. Heitz, Kevin A. Frankel, Robert Offer, Hopkins & Sutter, William Carlisle Herbert, Christopher W. Zibart, Mary Kay McCalla, William T. Casey, James M. Falvey, Parker, Milliken, Clark, O'Hara & Samuelian, Nowland C. Hong, Claire D. Johnson, Michael S. Simon, Buchalter, Nemer, Fields & Young, Jack I. Samet Stephen K. Lubega, Cheryl A. Orr, J. Karren Baker and John Ingersoll for Defendants and Respondents.

## OPINION

**THOMPSON, J.***—This is the fourth opinion of the Court of Appeal spawned by insolvency proceedings involving Executive Life Insurance Company (ELIC), a series which threatens to eclipse in scope, if not in time, the 30-year history of similar past litigation involving Pacific Mutual Life Insurance Company of California.[1] In *Texas Commerce Bank* v. *Garamendi* (1992) 11 Cal.App.4th 460 [14 Cal.Rptr.2d 854] and *Commercial Nat. Bank* v. *Superior Court* (1993) 14 Cal.App.4th 393 [17 Cal.Rptr.2d 884] we recounted some of the background of these proceedings. We further summarize the background here to set the context of this opinion and to define various acronyms employed in it.

ELIC, a California-based life insurance company, had in the 1980's issued conventional life insurance policies and annuities and also innovative annuity-like products known as Guaranteed Investment Contracts (GICs). These included contracts funding (1) pension and profit sharing plans (Pension-GICs), (2) bond liability of municipalities (Muni-GICs), and (3) structured settlements reached in tort cases; as well as single premium immediate annuities certain (SPIAs) and single premium deferred annuities (SPDAs).

---

*Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.

[1] Recently, in *Texas Commerce Bank* v. *Garamendi* (1994) 28 Cal.App.4th 1234 [34 Cal.Rptr.2d 155], Division Two of this court decided issues dealing solely with costs and attorney fees under Code of Civil Procedure section 1717, issues which are not directly present here.

As required by law, ELIC established reserves representing its future liabilities on these contracts. The reserves were funded by investments, primarily in high yield fixed income securities with no, or very low, credit ratings. By 1991 the market in these high-risk bonds had crashed. A large proportion of the bonds in ELIC's portfolio were in default, and the remainder had suffered serious declines in value so that ELIC reserves were grossly inadequate. The reserves faced a further serious deterioration because of the equivalent of a "run on the bank." Policyholders whose contracts permitted were cashing out their contracts with ELIC, requiring ELIC to dispose of its better investments to raise necessary cash.

As mandated by Insurance Code sections 1010 et seq.,[2] the Insurance Commissioner (Commissioner) seized the assets of ELIC and placed the company in conservatorship on April 11, 1991. ■ The Commissioner is an officer of the state (*Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 354 [139 P.2d 908]) who, when he or she is a conservator, exercises the state's police power to carry forward the public interest and to protect policyholders and creditors of the insolvent insurer. (*Carpenter* v. *Pacific Mut. Life Ins. Co.* (1937) 10 Cal.2d 307, 330-331 [74 P.2d 761].) "The public has a grave and important interest in preserving the business [of the insolvent insurer] if that is possible." (*Id.* at p. 329.) Hence while the Commissioner as conservator has the power either to rehabilitate the insolvent insurer (§ 1043) or to liquidate it (§ 1016), liquidation is a last resort. (*Carpenter* v. *Pacific Mut. Life Ins. Co.*, *supra*, 10 Cal.2d at p. 329.)

In exercising this power, the Commissioner is vested with broad discretion. (*Commercial Nat. Bank* v. *Superior Court*, *supra*, 14 Cal.App.4th at p. 402.) This discretion is subject to statutory limitations (see *id.* at p. 409) and the requirement that the exercise of discretion be neither arbitrary nor improperly discriminatory. (*Carpenter* v. *Pacific Mut. Life Ins. Co.*, *supra*, 10 Cal.2d at p. 329.) The Commissioner as conservator of the insolvent insurer is also a trustee for the benefit of all creditors and other persons interested in the insolvency estate. (§ 1057.)

Complying with *Carpenter*'s preference for rehabilitation, the Commissioner, after negotiations with interested parties, crafted a "rehabilitation plan" for ELIC. This plan provided for new policies to be issued to policyholders of ELIC by a successor insurer, with these policyholders entitled to "opt out" and receive the liquidation value of their claims if they wished. In ruling upon a petition for writ of mandate in *Commercial Nat. Bank* v. *Superior Court*, *supra*, we disapproved three discrete aspects of the voluminous and detailed plan. (14 Cal.App.4th at p. 398.) "[W]ith the hope and

---

[2]All statutory references are to the Insurance Code unless otherwise stated.

expectation that the deficiencies [discussed in the opinion] will be corrected and a new plan submitted that can be approved[,]" (*ibid.*) we ordered that a peremptory writ of mandate issue requiring the trial court to "vacate its order/judgment . . . and to proceed according to law." (*Id.* at p. 421.)

In response to the peremptory writ, and after the Commissioner negotiated settlements with all of the many interested policyholder groups except one, he adopted a modified plan. He sought and obtained court approval of the settlements and the modified plan. The impact of our decision in *Commercial National Bank* upon the original rehabilitation plan, the validity of some aspects of the modified rehabilitation plan, the validity of the settlements, and the propriety of the professional fees approved by the court are the primary subjects of this appeal. The following are the appellants: Commercial National Bank in Shreveport and some other similarly situated banks (Commercial National), who are indentured trustees of Muni-GICs purchased in 1986; Texas Commerce Bank-El Paso (Texas Commerce), which is the indentured trustee of a Muni-GIC purchased in 1986; Wallace Albertson, Mellvine Fuchs and Carole H. Fuchs (the Albertson appellants), who are holders of ELIC contracts; and Howard, Weil, Labouisse, Friedrichs Incorporated and four other similarly situated entities (Underwriters), who are underwriters of ELIC issues. Underwriters are defendants in class action lawsuits for Securities Act violations and related claims arising out of their activities in connection with the sale of ELIC contracts. Underwriters participated in all proceedings in the trial court as "interested parties similar to amicus curiae."

For convenience we later refer to appellants collectively unless context requires that we designate more specifically. Respondents are the Commissioner; Aurora National Life Assurance Company (Aurora), the purchaser of ELIC's insurance business; and other interested parties to whom we similarly refer as respondents unless context requires otherwise.[3]

We first reject the claim of appellants that the sale of the ELIC bond portfolio must be rescinded. Addressing appellants' challenge to the court's approval of the settlement agreements, we conclude that its approval of the settlement giving class 5 priority to post-1988 Muni-GICs is unsupported by the record, and reversal is required. We conclude that appellant Commercial National is entitled to interest on the interim payments it should have received after its right to receive such payments was finally adjudicated.

---

[3]Electronic Data Systems Corporation, purchaser of a post-1988 Pension-GIC, filed a "protective" notice of appeal and opening brief addressing its right to class 5 priority status and its support for the modified rehabilitation plan. Its position is aligned with that taken by other respondents, and we include it in that designation.

We reject all of the other numerous contentions of appellants. The rehabilitation of ELIC, required in the public interest, is a continuing process. We thus emphasize that our action on this appeal affirms the validity of the modified rehabilitation plan except in the particulars we have noted. The modified rehabilitation plan remains in effect subject only to the need for the relatively minor further proceedings we have ordered and any corrections that will result from this appeal.

## I

## STANDARD OF REVIEW

■ All parties correctly proceed on the premise that the actions of the Commissioner are subject to judicial review. Contrary to what is implicit in many of the arguments of appellants, this review is not de novo. The trial court reviews the Commissioner's actions under the abuse of discretion standard (*Commercial Nat. Bank* v. *Superior Court, supra*, 14 Cal.App.4th 393, 398): was the action arbitrary, i.e., unsupported by a rational basis, or is it contrary to specific statute, a breach of the fiduciary duty of the conservator as trustee, or improperly discriminatory?

We also test the action of the trial court by the abuse of discretion standard. (See *Baggett* v. *Gates* (1982) 32 Cal.3d 128, 142-143 [185 Cal.Rptr. 232, 649 P.2d 874].) In this connection we employ the equivalent of the substantial evidence test by accepting the trial court's resolution of credibility and conflicting substantial evidence, and its choice of possible reasonable inferences. (See *Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 478-479 [243 Cal.Rptr. 902, 749 P.2d 339].)

## II

## SALE OF THE ELIC PORTFOLIO OF JUNK BONDS

A. *Background*

Upon taking possession of the assets of ELIC, the Commissioner was acutely aware of the risk of further depreciation in value of the ELIC investment portfolio, which contained approximately $6 billion in par value of high risk bonds aptly denominated "junk." Conflicting expert opinions of the actual value of the portfolio ranged from $2.6 billion to $5.4 billion, with the higher valuations dependent upon a workout of the portfolio over a lengthy period of time. Cognizant of his primary obligation to protect the policyholders of ELIC and to preserve their insurance coverage if possible

(*Carpenter* v. *Pacific Mut. Life Ins. Co.*, *supra*, 10 Cal.2d 307, 329), the Commissioner determined that the risk of a long term workout was unacceptable and that the ELIC junk bond portfolio should be liquidated as expeditiously as feasible, accompanied by provision of restructured policies to ELIC policyholders by a new insurer. He accomplished this objective by exposing the bond portfolio broadly to the market and eventually conducting an auction. A European consortium led by Altus Finance was the successful bidder. Altus purchased the offered portfolio for a sum in excess of $3 billion. The other members of the consortium invested in Aurora, a new company formed to purchase and operate the insurance business of ELIC. Aurora offered restructured policies to the former ELIC policyholders in accordance with a modified rehabilitation plan. For convenience, we refer to this consortium as Altus when discussing the transaction as a whole; we refer to Aurora when discussing the restructured insurance company.

This aspect of the appeal presents two clusters of issues. Some of the appellants attack the process of bond sale employed by the Commissioner and approved by the court after its own expanded auction process. These appellants seek rescission accompanied by the remedy of restitution to the insolvency estate from Altus of $800 million which they assert is the excess of the market value of the bonds over the purchase price paid. Other appellants claim, some in conjunction with the first contention, that our decision in *Commercial National Bank* invalidated the rehabilitation plan of ELIC of which the bond sale was an inseverable part. These appellants thus assert that the bond sale to Altus has been per se invalidated by that decision, triggering the right to restitution.

As we explain below, the first cluster of contentions runs afoul of the applicable standard of review. The second contention misconstrues the procedural posture of *Commercial National Bank* and hence the actual scope of its holding, which in no way invalidated either the entire rehabilitation plan or the sale of the bonds.

B. *Summary of Facts*

Recited as required by the applicable standard of appellate review, the record establishes the following. When ELIC was taken into conservatorship its investment portfolio funding the reserves against its policies consisted of the worst of the high risk bonds. A run on ELIC's assets during 1990 had caused its better and more liquid bonds to be sold. About 43 percent of the junk bond issuers were already in default, in bankruptcy, or being restructured. Another 25.3 percent faced potential restructuring. Almost half of the portfolio was invested in depressed industry sectors.

Holding the bonds for an orderly liquidation over time would involve ELIC in an unacceptably difficult and complicated workout of the portfolio and was fraught with risk. A similar effort to liquidate the junk bond portfolio of Columbia Savings & Loan had not been successful. Mere announcement of the immediate sale of such large blocks of junk bonds would have depressed the market.

The ELIC portfolio presented risks of illiquidity and concentration. Over half of the junk bond holdings were in positions exceeding $25 million, with 17 percent in positions exceeding $100 million. Approximately 58 percent of the portfolio consisted of holdings exceeding 20 percent of the particular bond issue with 7.5 percent consisting of over one-half of the issue. Quoted market prices for junk bonds were set by trades of $1 million to $2 million and not the large quantities ELIC owned. This concentration and a limited number of potential purchasers made disposition of the portfolio extremely difficult.

The trial court expressly found that concerns about the risk profile were not unreasonable. To reduce the risk to the ELIC policyholders, the Commissioner, based on expert advice, determined to sell the bonds at auction as an entire block.

There had been prior discussions with Hartford Insurance Company and Altus regarding the sale of ELIC. By the time it was placed in conservatorship, ELIC had been engaged in "lengthy discussions" with Altus.

The Commissioner formed a working group of investment bankers and other experts to structure the sale process. This group assembled all the investment records, reinsurance agreements and financial data needed to evaluate the financial condition of ELIC and its bond portfolio. All of this data was made available to prospective purchasers in a "data room" at the Los Angeles premises of ELIC.

On May 21, 1991, the Commissioner published and publicized a memorandum serving as a request for proposals to purchase and setting out a framework for bids from any interested parties. This memorandum also described a contemplated structure for rehabilitation of ELIC's insurance business by a purchasing company denominated "NEWCO" for convenience. The memorandum required that NEWCO guarantee the level of benefits to be provided to ELIC policyholders and contract holders in their restructured NEWCO contracts. The memorandum continued that in order to provide these guarantees, investors in NEWCO would need to evaluate the ELIC bond portfolio as well as ELIC's other assets and then provide new capital and letters of credit sufficient to support the guarantees.

Recognizing that this was a complex transaction which could involve a virtually infinite number of variations in detail, the working group determined to create a template in which the detail had been worked out. The Commissioner announced that he would negotiate with Altus to create this target, called a "definitive agreement." The Commissioner's memorandum to prospective bidders announced that the definitive agreement, if and when reached, would be subject to overbids by which other parties would have the opportunity to take over the investor position in the agreement. The memorandum specified the economic factors the Commissioner would consider in evaluating bids.

The May 21, 1991, memorandum to bidders provided that when a definitive agreement was reached it would be filed with the court, with a hearing set 60 days after filing. During this period other bids could be filed and would be considered by the Commissioner and the court. The memorandum, including a request for proposals, was widely distributed and publicized so that the financial community was well aware of it.

While negotiations with Altus were proceeding, the working group met with other prospective bidders, provided them with information, and answered their queries as to how to structure the transaction. Care was taken to provide other potential investors with access to the same information that Altus possessed.

During this period of negotiations with Altus, the working group received other bids and discussed them with the bidders, pointing out portions of the bids which were considered deficient. The group developed methodology for evaluating bids which looked to the aggregate value to the ELIC policyholders.

Altus and the Commissioner entered into the definitive agreement on August 7, 1991, and its general structure was widely publicized. This agreement provided for the transfer of ELIC's assets to three entities. The first, NEWCO (later to become Aurora), would be a new California-based stock life insurance company to be managed by the investor group. The second entity, Altus, would pay $2.7 billion to NEWCO for the major portion of the ELIC junk bond portfolio. The third entity constituted a liquidating trust to be operated by the Liquidation Division of the Department of Insurance to dispose of ELIC real estate and other assets worth approximately $680 million not transferred to the investor entities. The investor group would provide an additional $300 million capital infusion to NEWCO.

The Commissioner issued a press release on August 7 announcing the definitive agreement and describing its general terms. The release stated that

the agreement would be filed with the court and that a 60-day period would then commence during which other potential buyers of ELIC could competitively bid for the company. It further announced: "The French investment group [Altus] has cleared the bar with an impressive opening height. I now encourage others to get into the competition and out-leap their performance."

On August 23, 1991, the trial court issued its order establishing an October 25 hearing date to consider the agreement and any competing bids, and establishing the bidding process. Any person interested in bidding against the definitive agreement was to do so by delivering a written proposal to the Commissioner by October 11. The Commissioner reserved the right "to reject bids which are nonconforming in the sense that, in the opinion of the [Commissioner], such bids are so dissimilar to the Definitive Agreement as to make a reasonable comparison too difficult or impractical to warrant pursuing them." The order further provided that interested bidders might seek to form consortiums or might submit bids dealing only with some aspects of the definitive agreement provided that such bids also offered to combine with other bids to effect a transaction comparable to the definitive agreement.

Eight bids were received by the Commissioner, including one from Altus. At the request of the Commissioner the trial court allowed an additional week during which any of the timely bidders could submit an improved final bid. Six bidders, including Altus, did so. The Altus improved bid increased its offered purchase price for the ELIC junk bond portfolio by $30 million and proposed to purchase an additional $120 million of lower quality junk bonds which originally were to remain as assets of the new company. Other relevant improved bids were submitted by Sierra National Insurance Holdings (Sierra) and the National Organization of Life and Health Guaranty Association (NOLHGA)

The Sierra bid provided for "bonds-in"; the junk bond portfolio would remain in the new company taking over the ELIC business, with Sierra providing a "capital cushion" of $1 billion to support the bond portfolio. Sierra proposed a profit-sharing arrangement by which the junk bond portfolio would be liquidated over time and policyholders of the restructured ELIC contracts would receive proportionate shares of any profit from the sale of the bonds. The NOLHGA improved bid, also bonds-in, which the Commissioner evaluated as producing the greatest financial value to the ELIC policyholders, presented a special variety of legal issues because of the makeup of the association.

On October 25 the Commissioner filed a "Selection of Bidder[s]" with the court, narrowing the field to NOLHGA, Altus and Sierra. The Commissioner

tentatively selected NOLHGA as the winning bidder subject to its satisfying the potentially serious legal obstacles involved in its bid. NOLHGA was granted an additional 10 days to provide concrete written proof that these problems would not occur. Failing this proof the Commissioner's recommendation of acceptance of the NOLHGA bid would be withdrawn and the field narrowed to Altus and Sierra. All other bids were rejected by the "Selection of Bidder[s]."

NOLHGA timely submitted its written response. The Commissioner viewed it as insufficient, particularly because the response did not adequately resolve the question of the ability of the state guaranty associations which made up NOLHGA to advance funds under applicable state laws. Failing that ability, the policyholders of ELIC would remain dependent upon the performance of the junk bond portfolio without a safety net to protect them against a downturn in the market.

Having narrowed the bidders to Altus and Sierra, the Commissioner invited these two to submit further overbids by November 11, 1991 and set November 14 as the date when he would accept the best overbid. Sierra and Altus both submitted overbids. Altus increased its bid for the transferred bonds by $250 million, bringing the total to $3.25 billion. Policyholder profit participations were increased and surrender charges were lowered. Sierra also improved its proposal.

The Commissioner selected the Altus bid over that of Sierra and sought approval of his recommendation from the trial court. Commencing on November 14 the court conducted an 11-day evidentiary hearing on the recommendation, in the course of which it unsuccessfully encouraged any interested persons to present other proposals. An enhancement agreement was negotiated with NOLHGA providing for improved payment of "covered claims," and NOLHGA then withdrew its bid and supported that of Altus.

The court considered the benefits of Altus's "bonds-out" proposal as compared to Sierra's and NOLHGA's "bonds-in" proposals; the value of ELIC's assets and liabilities; the best method and necessary time frame for marketing the junk bonds; the availability of other bidders in the event of a differently structured sale; and ultimately whether outright liquidation or rehabilitation would be in the best interest of the ELIC policyholders. These questions were largely addressed by expert testimony, and as might be expected, the testimony was conflicting.

The court resolved conflicting evidence by affording greater credibility to testimony to the effect that (1) maintenance of the ELIC bond portfolio was

extremely risky; (2) managing the portfolio in order to liquidate the bonds over time would require the commitment of substantial additional capital, forebearance of interest, and commitment of management resources; (3) breaking the portfolio into segments rather than disposing of the portfolio as a single block was not feasible if liquidation was not long delayed; and (4) the Altus bid provided significantly better return and less risk to the policyholders than the Sierra and NOLHGA bids.

Based on this view of the evidence, the trial court found: "The record of these proceedings demonstrates that the bid and negotiating process has been diligently, vigorously and intensely pursued by the Commissioner and his team. No evidence has been offered to overcome the presumption of Evidence Code section 654 as it applies to the Commissioner. More significantly, it also appears that the Altus/Aurora bid was the only bid that contemplated a complete and comprehensive rehabilitation on a 'bonds out' basis. . . . There is nothing to suggest that there exists a competing bid or that the Commissioner and his team have 'left anything on the table.' "

The court also found that the $3.25 billion paid by Altus for the ELIC bond portfolio "reflected the fair value of the Transferred Bonds at the time of the sale," i.e., when the court approved it.

## C. *Contentions*

■ We first note contentions which have unnecessarily encumbered the process of this appeal. Relying upon evidence that the trial court implicitly rejected in favor of contrary evidence, appellant Texas Commerce and the Albertson appellants claim that the process and terms of the sale were unreasonable and the sales price inadequate to the extent of $800 million, all on the assumption that the portfolio should not have been sold as a single block. They claim also that the trial court failed to find the value of the bonds as of the date of the confirmation hearing. We reject these contentions because they ignore: (1) the standard of review of trial court findings supported by substantial evidence approving the sale of the portfolio as a single block, thus valuing the portfolio at $3.25 billion; and (2) the fact that the trial court made the finding that the appellants state it did not.

Appellants argue that our opinion in *Commercial National Bank* requiring valuation of opt-out claims as of the closing date (14 Cal.App.4th at pp. 416-421) forecloses approval of the bond sale because the $3.25 billion valuation was determined as of the April 1991 conservation, not the March 1992 closing of the bond sale. The argument is contrary to the August 13, 1993, statement of decision in which the trial court expressly found the Altus bid "*reflected the fair value of the Transferred Bonds at the time of the sale.*"

We now turn to contentions of substance. In varying language appellants contend that the structure of the auction violated a supposed duty of the Commissioner imposed by section 1037, subdivision (d) to sell the bonds in a commercially reasonable manner realizing reasonable market value.

Section 1037, subdivision (d) authorizes the Commissioner as conservator to sell estate property "at its reasonable market value," subject to first obtaining court permission if the value of property sold exceeds $20,000, or "in cases other than . . . sale, or transfer on the basis of reasonable market value, upon such terms and conditions as the commissioner may deem proper." Appellants, however, fasten upon the terms of Commercial Code section 9504 dealing with foreclosure sales. That section requires that the disposition of the encumbered property be conducted "in a commercially reasonable manner." (*Id.* at subd. (3).) Appellants claim that the auction of the ELIC portfolio as a whole rather than in smaller blocks was not commercially reasonable.

We reject appellants' contention. Commercial Code section 9504 is inapplicable to the administration of estates of insolvent insurers. The purpose of Commercial Code section 9504 is protection of debtors against sales at inadequate prices of property securing their debts. Section 1037, subdivision (d) is part of a comprehensive statutory scheme which serves primarily to protect policyholders of insolvent insurers by a process of rehabilitation. Thus risk to policyholders in the process adopted is a primary consideration, and the key question here is the propriety of the auction sale in this light.

Here the Commissioner's first duty was to the "grave and important [public] interest" in not depriving the ELIC policyholders of the protection of their policies. (*Carpenter* v. *Pacific Mut. Life Ins. Co., supra,* 10 Cal.2d 307, 329.) The Commissioner determined that this duty was best discharged by a "bonds-out" reorganization. Substantial evidence supports the trial court's approval of this determination. The Commissioner further determined that avoidance of risk to the ELIC policyholders required the sale of the ELIC bond portfolio as a block and that other methods were not feasible.

Substantial evidence in the trial court record supports this determination on each of two theories. If "reasonable market value" is given its ordinary meaning, the price realized at the ELIC bond auction satisfies the test. Market value is a product of the relevant market. If, as here, the only appropriate relevant market is that for a quick sale of a single immense block of assets, the eventual price obtained in a highly publicized, open and fairly conducted auction is the best evidence of market value.

Even if it is assumed that obtaining "market value" required sale of the bonds in smaller blocks over time, the sale in this case meets the requirements of section 1037, subdivision (d). Avoidance of risk required that the

sale be at an auction of the bonds as a block. This would constitute a sale at "other than . . . on the basis of reasonable market value, upon such terms and conditions as the commissioner may deem proper." (§ 1037, subd. (d).) The sale was properly approved by the court because of the unacceptable risk inherent in a long-term liquidation.

## D. *Denial of Appellants' Motion for Rescission*

Quickly following our decision in *Commercial National Bank*, appellants filed a motion in the trial court seeking rescission of the sale of the ELIC bond portfolio to Altus. The motion, and this appeal claiming trial court error in denying it, are based upon the following syllogism: (1) the Court of Appeal in *Commercial National Bank* invalidated the ELIC rehabilitation plan; (2) the sale of the bonds is inseparable from the remainder of the rehabilitation plan; and hence (3) the bond sale was invalid. Underwriters add the theory that the bond sale should be rescinded because the Commissioner and Altus agreed to transfer the bonds under a mutual mistake of law concerning the plan's validity and that there was a failure of consideration by reason of the plan's invalidity. Without citation or significant argument, Underwriters also asserts that the public interest will be prejudiced if the bond transfer is allowed to stand. Unaccompanied by support as it is, we reject this last argument without discussion. (See *Miller* v. *Kennedy* (1987) 196 Cal.App.3d 141, 147 [241 Cal.Rptr. 472].)

Two segments of our opinion in *Commercial National Bank* are the basis of appellants' claim that the opinion invalidated the rehabilitation plan, but a third deserves equal attention. The preamble to the opinion states, "We now consider the . . . question of the validity of the rehabilitation plan . . . as formulated by the Commissioner of Insurance . . . and approved by the respondent court." (14 Cal.App.4th at p. 397.) The disposition paragraph of the opinion provides, "Let a peremptory writ of mandate issue directing the respondent to vacate its order/judgment of July 31, 1992, and to proceed according to law." (*Id.* at p. 421.) Between the quoted portion of the preamble and the disposition we said: "Because of these deficiencies [the three identified in *Commercial National Bank*], we must direct that the order approving the rehabilitation plan be set aside. We do so with the hope and expectation that the deficiencies will be corrected and a new plan submitted that can be approved." (*Id.* at p. 398.)

Appellants now argue in effect that the first two segments quoted above are the seeds of destruction of the hopes and expectations expressed in the third. They treat *Commercial National Bank* as a mandate to return to square one in the conservatorship.

Appellants misconstrue the scope of *Commercial National Bank* because they ignore its procedural posture. *Commercial National Bank* reached us on petition for writ of mandate filed by parties who are appellants here. ■ Mandate is not a matter of right but rather a prerogative writ issued in the discretion of the reviewing court upon an adequate showing of necessity, including inadequacy of remedy by appeal. (See *Driving Sch. Assn. of Cal.* v. *San Mateo Union High Sch. Dist.* (1992) 11 Cal.App.4th 1513, 1518 [14 Cal.Rptr.2d 908]; Code Civ. Proc., § 1086.)

■ We accepted jurisdiction in the writ proceeding because of a showing made by appellants, then acting as petitioners, that there was such a need for quick disposition of the questions raised in the petition that the remedy of an appeal disposing of the issues was inadequate. We decided the questions as to which we issued our alternative writ and nothing more. Indeed we lacked the power to extend the scope of our decision because to have gone beyond the dimensions of the alternative writ would have denied notice and opportunity to be heard to the respondents. (See *Kowis* v. *Howard* (1992) 3 Cal.4th 888, 894-895 [12 Cal.Rptr.2d 728, 838 P.2d 250].)

Thus *Commercial National Bank* determined only that the plan then before us was deficient: (1) in adopting a two-tier system for valuing claims; (2) in utilizing a dual valuation system which was discriminatory; and (3) in selecting an improper date for the valuation of the claims of opt-outs. (14 Cal.App.4th at p. 398.) None of these deficiencies impacted in the slightest the transfer of the insurance business of ELIC or the sale of its bonds. All were concerned with valuation for the purpose of distribution to policyholders, and none was of such significance as to cause a much more expansive rehabilitation plan to fail in its entirety.

We thus conclude that the basic premise of appellants' argument fails. Appellants having failed to clear the first hurdle to their contention, we need not address their further arguments related to nonseverability and the process employed by the trial court in ruling on their motion.

## III

### SETTLEMENT OF PRIORITIES

### A. *Background*

In *Texas Commerce Bank* v. *Garamendi, supra,* 11 Cal.App.4th 460 we held that Muni-GICs issued by ELIC prior to January 1, 1989, were

insurance annuities[4] within the meaning of section 101, and hence entitled by section 1033 to class 5 "policyholder" liquidation priority in distributions from the insolvent estate of ELIC, a priority superior to the class 6 status of general creditors. (11 Cal.App.4th at p. 465.) The assets and liabilities of the ELIC insolvent estate are such that in all probability class 6 creditors will receive nothing on their claims.

In its 1988 session and effective January 1, 1989, the Legislature enacted section 10541. This statute authorizes California life insurers to transact business in "funding agreements," annuity-like agreements which lack a mortality or morbidity contingency. It is the lack of this contingency that is the primary characteristic distinguishing funding agreements from other annuity-type products of ELIC. So far as relevant here the only annuity-like contracts lacking this contingency which are expressly excluded from the definition of funding agreements are those funding structured settlements. Funding agreements are expressly stated to be a noninsurance product, a designation which precludes the class 5 priority afforded life-contingent annuities and relegates funding agreements to class 6. In dictum (because we held section 10541 is not retroactive), we stated in *Texas Commerce*, "Section 10541 has provided since 1989 that contracts with the characteristics of Muni-GICs are noninsurance funding agreements . . . ." (11 Cal.App.4th at p. 491.)

*Texas Commerce* was a declaratory relief action which had made its way through the trial court and Court of Appeal while the Commissioner's conservancy of ELIC was proceeding in the same trial court. After our decision in *Texas Commerce*, the Commissioner and trial court were authoritatively informed of the class 5 priority status of the pre-1989 Muni-GICs issued by ELIC and informed of this court's emphatic leanings with respect to the class 6 priority status of post-1988 Muni-GICs. The issue of the priority status of the post-1988 GICs was, however, not adjudicated in the trial court.

After our decision in *Commercial National Bank, supra,* 14 Cal.App.4th 393 disapproved three aspects of the Commissioner's original rehabilitation plan, virtually all of the parties to the matter save the Commercial National Bank policyholders entered into a series of settlement agreements. These settlements resolved the priority issue by affording class 5 status to all ELIC GICs, including the post-1988 Muni-GICs, together with an agreement of

---

[4]The pre-1989 Muni-GICs at issue in *Texas Commerce* were annuities-certain, contracts requiring periodic payments for a specified term, but not contingent upon human life, as distinguished from life annuities, which are contingent upon human life. (See *Texas Commerce Bank* v. *Garamendi, supra,* 11 Cal.App.4th at p. 469.)

the estate to pay the reasonable attorney fees of these groups of claimants up to stated maximums.

The trial court approved the settlements. In accordance with his fiduciary responsibility to all claimants, the Commissioner asked the court to extend class 5 priority to holders of post-1988 SPDAs and SPIAs. Holders of these contracts were not represented by counsel and had thus not taken part in settlement negotiations. The trial court granted the motion and incorporated the terms of the settlements in the modified rehabilitation plan.

The settlements were reached in a climate of widespread controversy. Virtually all of the parties except the Commissioner objected to the early versions of the original rehabilitation plan. Aurora, which possessed a strong interest in terminating the litigation, agreed to transfer to policyholders all appreciation above the original contract price specified for "Base Assets," a sum of about $162 million at the time of the Modified Plan's approval. Aurora also agreed to a "hardship" payment of $20 million payable out of its future profits to holders of structured settlement annuities. The agreements gave all policyholders a voice in the management of trusts established to liquidate assets retained by ELIC.

Aurora further reduced the charges payable on policy surrenders during a five-year moratorium period contained in policies restructured by the original plan. To further facilitate final resolution, Aurora made a substantial fund available to policyholders who chose not to contest the plan and "opted-in."

By the terms of the settlements, holders of post-1988 Muni-GICs gave up their previous claims to interim payments and interest for the two-year period from the conservation date until the closing, withdrew their joinder in the motion to rescind the junk bond sale, withdrew their objection to a provision for payment of $20 million in additional benefits to structured settlement contract holders, and waived Racketeer Influenced and Corrupt Organizations Act (RICO) and Securities Act claims against ELIC.

All settling parties agreed to consult with the Commissioner concerning any future dispute that might arise concerning future modifications to the plan and to join the Commissioner in seeking legislation granting class 5 priority to funding agreements.

The near-global nature of the settlements is significant to the context in which the class 5 priority status was granted. Before the settlements, virtually all of the parties to the matter were asserting positions which in one way

or another and to varying degrees were inconsistent. The settlements thus materially reduced the scope of the litigation, a factor clearly of weight in justifying the Commissioner's actions.

## B. *Contentions*

In this segment of the appeal Commercial National and Underwriters contend that: (1) the trial court erred in holding that the Commissioner possessed discretion to settle claims to priority; (2) as a matter of law the post-1988 Pension-GICs and Muni-GICs, SPIAs and SPDAs are funding agreements not entitled to class 5 priority; and (3) if the Commissioner possesses discretion to settle conflicting claims to priority, this discretion was abused because of the weakness of the settling parties' claims to Class 5 priority and minimal benefit to the estate from concessions made by them. They argue that collateral estoppel precludes classification of these settling post-1988 claimants as entitled to class 5 priority. Appellants also attack the trial court holding that the Commissioner acted within his discretion in voluntarily extending class 5 priority to SPDAs and SPIAs.

Respondents counter with arguments directly contradicting those of appellants and add the contention that section 10541 does not impact on priorities.

■ We first conclude that section 10541 does affect priorities by defining the nature of contracts classified as "policies" entitled to class 5 priority by section 1033, and reject the contention that this issue is precluded by collateral estoppel. ■ We next conclude that the power vested in the Commissioner by section 1037, subdivision (c) to settle claims against the insolvency estate includes discretion to settle disputes concerning relative priorities of claimants in appropriate circumstances and that the fiduciary duty of the Commissioner empowers him to extend the benefits of any settlement to similarly situated unrepresented parties.

The powers of the Commissioner in this regard are, as in other respects, limited by the requirements of rationality, compliance with statute, and prohibition against improper discrimination. We do not reach the question of precise delineation of the extent of the discretion of the Commissioner in this regard. ■ We conclude only: (1) that the case for class 5 priority of all ELIC GICs except the post-1988 Muni-GICs is so strong and the benefit to the estate from the settlements so great as clearly to justify the Commissioner's exercise of discretion to settle; and (2) that, at the other extreme, the record here fails to establish a rational basis for extending class 5 priority by settlement to the post-1988 Muni-GICs.

## C. *The Impact of Section 10541 on Priority*

Respondents claim that section 10541 had no impact upon the priority scheme established by section 1033. They argue further that: (1) to construe

section 10541 as affecting the priority scheme established by section 1033 is to hold that the latter section was repealed by implication, a disfavored proposition; (2) the purpose of section 10541 was to permit California life insurers to compete in a burgeoning national market for funding agreements and not to affect priorities in conservatorship; and (3) lack of Class 5 priority for these contracts would in fact place California insurers at a competitive disadvantage in marketing funding agreements.

### 1. *Analysis of the impact of section 10541*

Analysis of the impact of section 10541 upon the priorities specified in section 1033 of necessity begins with our decision in *Texas Commerce*. There, in dealing with the priority status of pre-1989 Muni-GICs issued by ELIC, we first took the necessary step of ascertaining the meaning of "all claims of policyholders" of California life insurers, the prerequisite in section 1033 for class 5 priority. We found part of the definition in section 101, which authorizes the sale of annuities as life insurance business. (11 Cal.App.4th at p. 470.) We found the remainder of the definition in the general law holding that annuities certain are annuities along with those which contain "a life contingency." (11 Cal.App.4th at p. 475.) *Texas Commerce* thus incorporated a holding that the definition necessary for class 5 priority afforded by section 1033 is to be found in other statutes.

The enactment of section 10541 changed the character of annuities certain which do not contain a mortality or morbidity contingency from insurance to funding agreements.[5] The section is express that these annuities are not a class of business provided in section 101. The legislative history of section 10541 reveals that as originally introduced, this progenitor bill did classify funding agreements as insurance, but that the statute as eventually enacted did not. It is clear therefore that with the enactment of section 10541, the foundation for the treatment of annuities certain as insurance in *Texas Commerce* disappeared. Inherent in the change in the legal nature of these contracts was a change in the nature of the status of their holders from policyholders to contract promisees, a class 6 priority in section 1033.

The Commissioner asserts that other language in *Texas Commerce* requires a contrary interpretation. There we dealt with a contention that, despite lack of retroactivity, section 10541 was applicable because section 1019 required that priorities be tested as of the date of liquidation. The latter section provides that all rights and liabilities of the insolvent insurer and creditors, shareholders, and other persons interested in the estate shall be

---

[5]Section 10541 excludes structured settlement agreements from the definition of funding agreements.

fixed as of the date of entry of the liquidation order unless otherwise specifically directed by the court.

In rejecting this contention in *Texas Commerce* we stated: "In contrast to section 1019, section 1033 deals exclusively with 'claims allowed.' . . . [I]t expressly acknowledges claim priorities created by other statutes under priority 4. Section 1033 expresses no parallel function for section 1019 to classify claims as between priorities 5 and 6. Had the Legislature intended section 1019 to control claim priorities via section 1033, we expect it would have expressly done so by including the term 'priorities' in section 1019 or by making express provision in section 1033." (11 Cal.App.4th at p. 493.)

The Commissioner's argument ignores the context in which the quoted language appears. In this portion of the *Texas Commerce* opinion we were dealing with the question of whether the phrase "determination of rights and liabilities" as of the date of liquidation contained in section 1019 also encompassed determination of priorities as of that date. In this context the phrase was not free of ambiguity. Our quoted language responds only to this question. (11 Cal.App.4th at pp. 492-493) Here, however, we are dealing with a definition which is express in section 10541 and which the rationale of *Texas Commerce* dictates is determinative of priority.

### 2. *Legislative purpose and unintended consequences*

The Commissioner adds the argument that construction of section 10541 as imposing class 6 priority status on funding agreements is contrary to the legislative purpose in enacting the section. As we note later in this opinion, this argument correctly recites the legislative purpose as enabling California life insurers to compete in a burgeoning national market for funding agreements. The argument continues that imposing class 6 priority on funding agreements in the event of insurer insolvency will place California insurers at a competitive disadvantage. While intriguing for its ingenuity, the argument confuses statutory purpose with unintended consequences.

Respondents correctly state that nothing in the legislative history of section 10541 discloses any legislative consideration of the impact of the section upon priorities. They argue that this state of the legislative record demonstrates a legislative intent to exclude this impact. Contrary to respondents' argument, the only inference we may reasonably draw is that the matter was not considered by the Legislature.

Determination of legislative intent is necessarily a legal construct based on statutory history and language, and here both point inescapably to an

intent to classify funding agreements as noninsurance. In this construct the proposition that the intent may lead to unintended consequences is irrelevant. A court may feel that legislative failure to consider a consequence was unwise, but the court may not substitute its personally perceived wisdom for that of the Legislature. To do otherwise would unduly extend the judicial power because the field of unintended consequences approaches the infinite.

### 3. *Implied repeal*

Nothing in the construction which we here adopt treats section 10541 as impliedly repealing section 1033. The concept of implied repeal is operative only when the two statutes are so irreconcilable and inconsistent that the two cannot stand together. The courts are bound if possible to maintain the integrity of both statutes if they can so stand. (*Department of Personnel Administration* v. *Superior Court* (1992) 5 Cal.App.4th 155, 191-192 [6 Cal.Rptr.2d 714].) Here there is no irreconcilable inconsistency between sections 10541 and 1033.

### D. *Collateral Estoppel*

Underwriters and Commercial National contend that collateral estoppel flowing from *Texas Commerce* precludes a holding that Pension-GICs differ in priority status from post-1988 Muni-GICs. *Texas Commerce* was a declaratory relief action seeking a declaration of section 1033 class 5 priority for pre-1989 Muni-GICs. The Pension-GICs intervened in the trial court and pursued their position as interveners in the Court of Appeal. Appellants assert that the Pension-GICs, while intervening on the ground that if declaratory relief were granted the assets available to them in distribution would be diminished, sought also to prove that there were material differences between the Pension-GICs and pre-1989 Muni-GICs. They assert further that the trial court denied this contention.

Taking the assertions of the Underwriters and Commercial National at face value, they do not establish issue preclusion. Issue preclusion requires both an identity of issue in the later and earlier cases and that the issue be entirely necessary to the decision in the earlier case. (7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, §§ 253, 268, pp. 691-692, 710-711; see also *Frommhagen* v. *Board of Supervisors* (1987) 197 Cal.App.3d 1292, 1301, fn. 3 [243 Cal.Rptr. 390].)

Neither requirement is met here. At both the trial and appellate levels, the *Texas Commerce* courts dealt with priority status of Muni-GICs issued before the January 1, 1989, effective date of section 10541. As our decision

in *Texas Commerce* demonstrates, at *that* time (prior to the effective date of section 10541) there was no material difference in the context of priority between the Pension-GICs and Muni-GICs. We were not called upon to decide, and did not decide, whether enactment of section 10541 effected a material difference between Pension-GICs and post-1988 Muni-GICs. It follows that there is no collateral estoppel on that issue.

E. *The Commissioner's Discretion to Settle a Dispute Among Claimants With Respect to Priority of Claims*

We now turn to the power of the Commissioner to settle claims regarding priority. Section 1037, subdivision (c) provides that the Commissioner "[s]hall have authority to compound, compromise or in any other manner negotiate settlements of claims against [the insolvent insurer] upon such terms and conditions as the commissioner shall deem to be most advantageous to the estate of the [insurer] being administered or liquidated or otherwise dealt with under this article." The questions presented are: (1) whether this power extends to settling a dispute regarding priority of claims; and (2) the nature of the Commissioner's discretion if the power exists.

The appellants view the discretion granted the Commissioner by section 1037, subdivision (c) to settle claims against the estate as referring only to compromises of claims against the estate as a whole and not to conflicting assertions of priority of claimants. From this reading they argue that section 1033, which sets priorities, is an absolute limitation on the Commissioner's discretion to settle claims.

Determination of the legal questions of whether the Commissioner has the power to resolve disputes over priority by way of settlement, and if so the extent of the Commissioner's discretion to do so, is no easy task. To our knowledge this is a question of first impression. The language of section 1037 itself supplies some guidance. Its preamble states that its subsections are applicable "except as otherwise expressly provided by this article." Section 1033 of that article (art. 14, § 1010 et seq.) establishing priorities in the conservancy estate does not refer to settlements.

■■■■ Section 1037, subdivision (c) is a legislative expression of policy favoring resolution of claims by settlement. Inherent in any claim is the question of collectability, of which priority is a necessary attribute. But the Legislature's definition of the role of the Commissioner as that of a trustee (§ 1057) may not be ignored, and in general fiduciary duty restrains the trustee from favoring one beneficiary over another. (See *Estate of Nicholas* (1986) 177 Cal.App.3d 1071, 1089 [223 Cal.Rptr. 410]; *Security Pacific*

*National Bank* v. *Geernaert* (1988) 199 Cal.App.3d 1425, 1432 [245 Cal.Rptr. 712].) Fiduciary duty might thus limit the definition of the meaning of "claims" as the word is used in section 1037, subdivision (c).

While the issue here is of first impression, we write not on a slate that is clean but rather on one that is hopelessly cluttered by authority in the field of bankruptcy. (See, e.g., *In re American Reserve Corp.* (7th Cir. 1987) 841 F.2d 159; *In re Miller* (Bankr. N.D.Ill. 1992) 148 Bankr. 510; *Matter of Egolf* (Bankr. N.D. Ind. 1989) 102 Bankr. 706.) The authority that has been cited to us and found by our own research is conflicting, to say the least. We thus look beyond sections 1037, subdivision (c) and 1057, first to construction of a similarly worded statute, former Probate Code section 718.5, and then to the pattern of the statutory scheme dealing with insurer insolvencies.

Former Probate Code section 718.5 authorized the estate's executor or administrator, "with the approval of the court, [to] compromise, compound or settle any claim against the estate or any suit brought by or against the executor or administrator as such, by the transfer of specific assets of the estate or otherwise. To obtain such approval, the executor or administrator shall file a verified petition with the clerk showing the advantage of the compromise, composition or settlement." In construing that section, our Supreme Court held that, despite the provisions of then Probate Code section 708 precluding allowance of claims against the estate barred by the statute of limitations, claims which were arguably barred could be settled so long as the claim was not "admittedly and on its face" barred by the statute. (*Estate of Lucas* (1943) 23 Cal.2d 454, 466 [144 P.2d 340].) Where there are "serious doubts as to the applicability of the statute [of limitations]" and "the rights of the respective parties cannot be conclusively determined without litigation, the representative, if acting in good faith and for the best interest of the estate, is entitled to enter into a compromise with the claimant." (*Id.* at p. 466.)

Former Probate Code section 718.5 is strikingly similar in its language to section 1037, subdivision (c), and the *Lucas* court construed the word "claim" as inclusive of collectability. Language from *Estate of Black* (1976) 65 Cal.App.3d 112, 117-118 [135 Cal.Rptr. 115], cited as supporting a contrary conclusion, is mere dictum unsupported by citation or articulated reasons.

There appears from the pattern of the statutes dealing with insurer insolvencies an underlying theme of resolution of questions for the benefit of policyholders by rehabilitation if possible. This is not merely a resolution of private rights, but also a matter of the public interest because of the character

of insurance. (See *Carpenter* v. *Pacific Mut. Life Ins. Co., supra,* 10 Cal.2d 307, 329.) In carrying out his or her responsibility, the Commissioner acts not only as a trustee but also as a servant of the state in the exercise of its police power. (See *Garris* v. *Carpenter* (1939) 33 Cal.App.2d 649, 654-656 [92 P.2d 688].) In some instances individual policyholders must suffer some detriment if this is necessary to carry out the purpose of the statutory scheme. (*Neblett* v. *Carpenter* (1938) 305 U.S. 297, 305 [83 L.Ed. 182, 189, 59 S.Ct. 170].) The limitation upon the Commissioner's authority is that its exercise be reasonably related to the public interest in rehabilitating the insurer (*Commercial Nat. Bank* v. *Superior Court, supra,* 14 Cal.App.4th at p. 416) and not be arbitrary or improperly discriminatory. (*Carpenter* v. *Pacific Mut. Life Ins. Co., supra,* 10 Cal.2d at p. 335.)

This leads us to conclude that pursuant to section 1037, subdivision (c) the Commissioner, acting as conservator, has the power to settle disputes over section 1033 priority. The question remains as to the propriety of the Commissioner's exercise of this discretion in this case.

F. *The Settlement Granting Class 5 Priority to GICs Other Than Post-1988 Muni-GICs*

1. *Legislative history of section 10541*

Section 10540, first enacted in 1945 and amended in 1957, authorized California life insurers to "accept funds under an agreement which provides for the accumulation of such funds for the purpose of purchasing annuities at future dates." Pursuant to this section the Department of Insurance permitted California insurers to issue Pension-GICs containing a life annuity option as an insurance annuity. (*Texas Commerce Bank* v. *Garamendi, supra,* 11 Cal.App.4th at p. 467.) In the years preceding 1986, insurers in other states were authorized to issue a new product called a "Funding Agreement." Funding agreements were used for diverse purposes such as payment to winners of state lotteries, funding of long term retirement agreements and structured damage settlements, and investments of bond proceeds by municipalities. (See Sen. Rules Com. Floor Analysis of Sen. Bill No. 901 (Apr. 22, 1987); letter to Sen. Newton Russell from FSA Insurance Services (Jan. 22, 1988).)

Prior to 1986, ELIC issued Muni-GICs, contracts of investment by public entities of proceeds of bond sales. In late 1986, the California Department of Insurance advised ELIC that it did not consider ELIC's Muni-GICs to be insurance annuities and forwarded an opinion letter concluding that they were not because, among other reasons, they did not comply with section

10540 by providing for the accumulation of funds with an option to purchase an annuity. (*Texas Commerce Bank* v. *Garamendi*, *supra*, 11 Cal.App.4th at p. 467.) ELIC ceased marketing the Muni-GICs. (*Ibid.*)

Because of the authorized issuance of these products in other states, particularly New York and Connecticut where many life insurers are domiciled, the lack of specific authority to issue these funding agreements placed California life insurers, including ELIC, at a competitive disadvantage. (Sen. Rules Com. Floor Analysis of Sen. Bill No. 901, *supra*.) To correct this disadvantage, the Association of California Life Insurance Companies in 1987 sponsored Senate Bill No. 901, the progenitor of section 10541, carried by Senator Russell. (Sen. Rules Com. Floor Analysis of Sen. Bill No. 901, *supra*; *Texas Commerce Bank* v. *Garamendi*, *supra*, 11 Cal. App.4th at p. 467.)

Senate Bill No. 901 traversed several permutations before being enacted in 1988 (eff. Jan. 1, 1989) as present section 10541, all for the purpose of permitting California life insurers to sell a product which, prior to the legislation, they were not expressly authorized to sell. (*Texas Commerce Bank* v. *Garamendi*, *supra*, 11 Cal.App.4th at p. 467.) The original March 3, 1987, version of Senate Bill No. 901, modeled on New York Insurance Law section 3222, provided that life insurers could issue funding agreements as part of their insurance business to fund benefits under employee benefit plans, to fund activities of organizations exempt from tax under Internal Revenue Code section 501, subdivision (c), to fund governmental programs including those of state entities, to fund structured settlements, and to fund programs of institutions with assets in excess of $25 million. This version of Senate Bill No. 901 expressly stated that funding agreements need not provide for payments based on mortality or morbidity contingencies.

As amended in the state Senate on April 6, 1987, the bill, while still authorizing California life insurers to deal in funding agreements, reversed course by providing that these agreements should not be deemed insurance. The amended bill retained the provision that funding agreements need not provide for payments based on mortality or morbidity contingencies. A further amendment in the Assembly removed the limitation upon classes of purposes for which funding agreements could be sold.

The present relevant language of section 10541 appears in an Assembly amendment of August 1, 1988: "As used in this section, the term 'funding agreement' means an agreement which authorizes an admitted life insurer to accept funds and which provides for an accumulation of those funds for the purpose of making one or more payments at future dates in amounts that are not based on mortality or morbidity contingencies. . . ."

■ It is clear from this history that the purpose of the legislation which became section 10541 was to permit California life insurers to compete in a new and growing market where previously their authorization to do so was questionable. The purpose was not to reclassify as noninsurance those products which life insurers were already authorized by section 10540 to issue. These previously authorized insurance products included those for the acceptance of funds to be accumulated for the purpose of purchasing life-contingent annuities at future dates. The reference to lack of mortality or morbidity contingency in section 10541 must be read in this light as not referring to accumulation contracts with a life annuity option which the Commissioner had treated as authorized activity of California life insurers before Senate Bill No. 901 was introduced.

Further confirmation that section 10541 was not intended to affect contracts containing a mortality-based payment option is found in the author's explanation of April 8, 1987, to the Senate Committee on Insurance Claims and Corporations. There the author stated, "Current California law specifically empowers life insurers to issue annuity contracts, many of which contain substantially identical features to the funding agreements contemplated under the proposed legislation." The effect of a mortality-contingent annuity or payment option as removing a contract from the definition of funding agreement is still further illuminated by the author's statement to the Assembly Finance and Insurance Committee on August 2, 1988. There the author stated: "The contract holder's payment rights under a funding agreement vary from contract to contract, and may be either in lump sum or periodic payments, *but in no event are based upon life contingencies.*" (Italics added.) This same statement is made in a letter from the author to the Governor urging his approval of the bill. (Letter from Sen. Russell to the Governor, Aug. 29, 1988.)

From the representative ELIC contracts included in the record here,[6] it appears that all but the Muni-GICs and GICs funding structured settlements involve annuity or benefit payment options based on mortality contingencies. GICs funding structured settlements are expressly excluded from the definition of funding agreements by section 10541. The Pension-GIC contracts, which are used to fund pension and profit-sharing plans, provide for premium deposits over a period of time. Fund value accumulates by reasons of the deposits plus interest on deposits made. Withdrawals may be made

---

[6]The record contains samples of Muni-GICs, Pension-GICs, SPIAs and SPDAs which were introduced as exhibits in the trial court. Since the parties opposing the settlements have failed to present other contracts containing different provisions relating to the existence or nonexistence of mortality contingencies, we will assume the contracts in the record are truly representative and base our analysis of the settlements on that assumption.

during the term, but in addition the insurer may be directed to purchase individual annuities for plan participants. These annuities may be for life or joint lives.

SPDAs provide for a death benefit if the annuitant dies before the annuity reaches maturity. When the annuity reaches maturity, the annuitant has the option of converting the SPDA to one of several "Annuity Benefit Payment Options," all but one of which provide for payments in amounts dependent on the annuitant's life expectancy.

SPIAs also contain several annuity payment options involving mortality contingencies as well as a death benefit, but they differ from Pension-GICs and SPDA contracts in that the annuitant must select either life annuity options or other options which are not life contingent at the time of purchase. The analysis we have employed with respect to the Pension-GICs and SPDAs is thus applicable only to those SPIAs in which a life-contingent annuity option was selected.

There is, however, another basis on which the Commissioner could determine that all the SPIAs had a strong claim to class 5 priority. Section 10541, the statute which relegates funding agreements to class 6 priority, defines a funding agreement as one which provides for the accumulation of funds. Principal does not accumulate in SPIAs because they are acquired by payment of a single sum to ELIC, and then periodic payments begin immediately, which reduce the principal originally paid. There is an argument that interest accrued on the fund created by the single premium and later paid to the contract holder is an accumulation. However, actuarial experts testified that these contracts do not provide for the accumulation of funds, thus adequately rejecting this potential argument.

Analysis of the terms of the Pension-GICs, SPIAs and SPDAs in light of the legislative history of section 10541 strongly supports the conclusion that contracts issued by ELIC containing life-contingent annuity or payment options, or which do not provide for an accumulation of funds, are not funding agreements. The Commissioner's exercise of discretion in entering into settlements which granted class 5 priority to holders of contracts with these characteristics is thus clearly justified. First, the Commissioner avoided the considerable expense to the estate and delay in the consummation of the rehabilitation plan incident to litigation most unlikely to succeed. Second, there was tangible benefit to the estate from the near-global nature of the settlements to the extent that the remaining litigation was made more manageable. Together these factors justify the settlements with GICs other than post-1988 Muni-GICs.

### 2. *The pattern of related statutes*

The conclusion that GICs and SPDAs with a life-contingent annuity or payment option and SPIAs are not within the ambit of section 10541 preserves the pattern of related California statutes. These contracts remain subject to the gross premiums tax on insurance, while funding agreements are not. (See Rev. & Tax. Code, §§ 12221, 12222; Ins. Code, § 10541.) In sum, the statutory history of section 10541 establishes a very strong case for treatment of ELIC Pension-GICs, SPDAs and SPIAS as insurance and not funding agreements.

### 3. *Contraindicators*

As is typical of most recitations of statutory history, the history here is not entirely one-sided. Some appellants point to the modeling of section 10541 on the New York statute, which is construed as treating GICs with a life annuity option as funding agreements if the option is such that the insurer's reserves on the contracts are based solely on economic and not mortality assumptions. These appellants argue that industry practice follows the New York approach. These arguments, while by no means specious, are overcome by the statutory history pointing in the opposite direction.

The New York construction of its funding agreement statute is relevant only if this interpretation was made known to the California Legislature when it enacted section 10541. The briefs asserting the relevance of this construction do not point us to this fact and our own research of statutory history has not disclosed it. While insurance industry practice is relevant to define technical terms used in a statute (*Texas Commerce Bank* v. *Garamendi, supra*, 11 Cal.App.4th at p. 486), it is not conclusive. Where, as here, the history of a statute reveals that the Legislature relied upon its own definition, that definition controls.

The Underwriters point to testimony of the general counsel of Pacific Mutual Life Insurance, whom they identify as "the principal author" of section 10541, as supporting their position. Suffice to say that a private sponsor of legislation does not acquire a proprietary interest in it. It is the legislative purpose and intent that controls and not that of a sponsor.

### G. *The Settlement Granting Class 5 Priority to the Post-1988 Muni-GICs*

The argument favoring Class 5 priority for the post-1988 Muni-GICs was so weak after our decision in *Texas Commerce* that the *Estate of Lucas* definition of claims that cannot be settled could well be applicable if this

were a probate matter. ▇▇▇ However, more than probate, rehabilitation of insolvent insurers is a matter particularly affected with the public interest. Of necessity, if required to satisfy the public interest, the Commissioner possesses considerable discretion in settling claims.

The *Carpenter* and *Commercial National Bank* limitations must of course be satisfied, and in particular the settlement must be both in the best interest of the conservancy estate and necessary to vindicate the public interest. (*Commercial Nat. Bank* v. *Superior Court, supra,* 14 Cal.App.4th at p. 416.)

▇▇▇ The post-1988 Muni-GICs do not contain a mortality-based annuity or payment option; they do provide for an accumulation of funds, and as the framework of analysis in *Texas Commerce* makes transparent, they are funding agreements entitled only to class 6 priority. In this connection the trial court was laboring under a fundamental mistake when it declared in its statement of decision approving this portion of the settlement that: "It is far from clear that these [post-1988 Muni-GIC] contracts are class 6 priority and, indeed, the Court would be inclined to rule that these contracts were Class 5 priority if the issue had to be resolved." It similarly found that the settlement agreement concerning the post-1988 Muni-GICs "is advantageous to the ELIC estate, and is within the reasonable range of permissible alternatives considering the relative strength of the parties' positions."

The trial court's mistake is such as to require reversal of that portion of its judgment approving the settlement granting class 5 priority to the post-1988 Muni-GICs. The benefit to the estate from this settlement was minimal. The post-1988 Muni-GICs' waiver of interim payments and interest was valueless because of lack of entitlement. Their waiver of RICO and Securities Act claims is essentially illusory in light of a record which shows virtually no hope of collectability of class 6 claims. The question of rescission of the bond sale continued to be pursued by other parties, as were questions of priorities and the propriety of various enhancements. The agreement to consult added little if anything to what counsel would be expected to do in any event, and the legislation proposed would be of value only if retroactive, a result the post-1988 Muni-GIC holders would be expected to pursue independent of the settlement.

The trial court also found: "The Rehabilitator's primary responsibility is to effect, if possible, a rehabilitation of Executive Life. Delay is fatal to the rehabilitation process; the proposed settlement reduces delay in the rehabilitation process. In the absence of the proposed settlement, and similar settlements entered into by the Rehabilitator and virtually all of the policyholder groups represented in the proceedings, it is likely that each policyholder group would assert every position favorable to its particular interests

and embroil the estate in expensive, time-consuming and unproductive litigation. Such litigation could delay the rehabilitation of the Executive Life for so long that it would become impracticable. The proposed settlement also furthers the public policies favoring the settlement of litigation, particularly complex litigation such as would result in the absence of the proposed settlement."

There is a significant omission in this finding. It does not state that the settlement of the claims of the post-1988 Muni-GICs materially contributed to the other settlements. Settlement of a claim which would not be justified in the absence of other parallel settlements might be justifiable if a global settlement including other claims is reached, or if the particular settlement materially contributes to an appropriate near global settlement which benefits the estate. In this case, however, there was no global settlement, and no material contribution to overall settlement by the settlement with the holders of the post-1988 Muni-GICs.

The Commissioner conceded at oral argument that there is no evidence in the record that the settlement with the post-1988 Muni-GICs was interlocked with the other settlements. Absent evidence that the former materially contributed to the latter, there is no rational basis for Commissioner's settlement with the post-1988 Muni-GICs in light of the weakness of their claim to class 5 priority. We hence reverse with directions to the trial court to vacate the portion of the judgment which approves this settlement.

IV

### Valuation of Policyholder Claims

Valuation of an insurance policy is based upon the reserve, an amount equal to the present value of the guaranteed benefits less the present value of future premiums, both affected by standard mortality tables where applicable. The extent of reduction from gross amounts to present value is determined by the interest rate employed; the higher the interest rate the greater the reduction. In calculating the value of both opt-in and opt-out policyholder claims, the Commissioner adopted a methodology denominated conservation date statutory reserves (CDSR). CDSR discounts to present value all ELIC contracts by a uniform rate provided by the Standard Valuation Law (§§ 10489.1-10489.10) as the rate existed on the conservation date in April 1991.

In contrast, the reserves actually carried on its books by ELIC were computed on the basis of the varying interest rates contained in its contracts,

which differed from contract to contract. This method is known as historic statutory reserves (HSR). If HSR were employed, contracts issued at a time of low interest rates such as the pre-1989 Muni-GICs would be subject to a lesser reduction to present value, resulting in greater contract value than comparable contracts issued at a time of higher interest rates.

The Commissioner elected to utilize the CDSR rate in valuing contracts for the purpose of determining the relative shares of opt-in policyholders in restructured policies and other proceeds of the rehabilitation plan and the liquidation value of the shares of the opt-outs. The trial court concluded that the Commissioner's choice of the CDSR method was appropriate. It found: "Weighing all [the] factors, the Court concludes that the Commissioner's selection of the CDSR method for use in the Modified Plan was proper, that CDSR is an appropriate method for valuing contract holder claims and that CDSR is a fair and uniform method that is neither discriminatory nor arbitrary."

In this aspect of their appeals, appellants attack this finding as based on a faulty premise and as unsupported by the evidence. Both contentions lack merit.

## A. *Claim That There Is a Single Method of Valuing Policies*

Appellants assert that our opinion in *Commercial National Bank* mandates the use of an historic statutory reserve, and no other, in valuing the policies. They rely upon the following language of *Commercial National Bank*: "If the actual interest rates underlying the implied rate contracts had been used . . . the resulting account values would have reflected the actual accumulated worth of the contracts as of the date of insolvency." (*Commercial Nat. Bank* v. *Superior Court, supra,* 14 Cal.App.4th at p. 413.)

Appellants take the quoted language out of context. In *Commercial National Bank* we disapproved a dual valuation method adopted by the Commissioner which utilized actual interest guaranteed by ELIC contracts where the interest rate was specified but utilized an "implied rate" where the contracts did not specify a rate. We disapproved this method because an interest rate was inherent in the latter category of contracts. We explained that, "Underlying the pricing of each of these contracts were certain pricing assumptions, including an assumption of the interest rate which would be earned during the life of the contract." (14 Cal.App.4th at p. 413.) We were express that in addition to the method of valuing the particular accounts involved in *Commercial National Bank*, "[t]here certainly are other ways in which to accomplish a fair and uniform means for valuing each account." (*Id.* at p. 416.)

Here the defect in valuation methodology present in *Commercial National Bank* is absent. This is not a situation in which the Commissioner employed an arbitrary and discriminatory rate to one class of contracts in the mistaken belief that an interest element was lacking in these contracts. The Commissioner applied a uniform interest rate to all ELIC contracts. The only possible discrimination in the Commissioner's methodology is that it does not take into account the price paid by individual contract holders and the interest rates provided in the various policies. But this is not discrimination in the legal sense.

From the date that the Commissioner seized the assets of ELIC and placed it in conservation, the holders of ELIC policies ceased to have claims on their policies. Conservation because of insolvency constituted a breach of contract on the part of ELIC. (*Caminetti* v. *Pacific Mut. Life Ins.* (1943) 23 Cal.2d 94, 102 [142 P.2d 741].) From that date forward the policyholders had only claims for breach of contract.

The amount to be received on each claim is the value of the policy, "that is, the value of the chance, based upon reasonable probabilities which is the essence of the insurance business." (*Caminetti* v. *Pacific Mut. Life Ins.*, *supra*, 23 Cal.2d at p. 108.) This amount "is each policyholder's share of the reserve. The reserve, viewed prospectively at any particular time, is the amount discounted at appropriate rates of interest to its value at that time, which will be required to meet the claims under the polic[y] in the future." (*Ibid.*)

Contrary to *Caminetti*'s command that in the situation of insolvency the insurer's reserves must be viewed prospectively, appellants would have us view them retrospectively. In *Caminetti* the insurer's insolvency resulted from reserves that were initially inadequate in light of the risks covered by the insurer's policies. The amount of the reserves applicable to the policies was in substance the same whether viewed prospectively or retroactively. Here, however, the insolvency of ELIC is the result of reserves which were originally adequate if properly invested but which deteriorated because of unwise investments by ELIC which grossly declined in value.

What an individual policyholder may have paid and the interest rate assumptions that determined price are thus no longer relevant. The breach of contract claims are based on the value of ELIC's promises. For example, in the case of two holders of unpaid notes of identical face value possessing claims for breach of contract because of the insolvency, it is irrelevant that one claimant paid par and the other acquired the note at a discount. (See *Commercial Nat. Bank* v. *Superior Court*, *supra*, 14 Cal.App.4th at pp. 414-415.)

## B. *Substantial Evidence Supports Selection of CDSR*

 Viewed as required by the standard of review, the record establishes that when an insurer calculates reserves, the interest rate and mortality tables prevailing at the time the policy is issued are used on the assumption that the insurer will invest the premiums it receives in assets whose maturity and interest rates match the obligation of the insurer. The asset-matching assumption was not supportable as to ELIC at the time of the conservation, so that even though ELIC's reserves were calculated in accord with the standard valuation law, they did not accurately reflect its ability to satisfy its liabilities to policyholders. Historic interest rates were not achievable for appropriate investment options in 1991. The historic reserve on ELIC policies calculated interest rates as high as 14.5 percent, while as of the conservation date the interest rate specified in the standard valuation law for the same type of policy was only 9 percent.

CDSR most accurately measures the assets required to fund the future guaranteed benefits lost by the contract holders as a result of the conservation. The lost benefits determined by CDSR totalled $9,304,000,000. In contrast, the historic reserves method would yield a computation of lost benefits of $8,870,000,000 and understate the liability of ELIC by approximately $434 million.

Expert testimony established that CDSR: (1) values the contract holders' claims for breach of their insurance contracts as of the conservation date; (2) is uniform among the contract holders; (3) fully reflects all future guaranteed benefits in the contract as of the conservation date; (4) is based upon nonsubjective methods and assumptions; and (5) is practical and capable of implementation.

While the record amply supports the Commissioner's choice of method of valuing policies and the trial court's approval of the method, appellants' challenges focus on contrary evidence which the trial court viewed as not persuasive. As we have been required to do with so many other contentions of appellants, we reject these arguments as contrary to the applicable standard of appellate review.

V

THE "HARDSHIP PAYMENTS" AND "ENHANCEMENTS"

## A. *Background*

After our decision in *Commercial National Bank*, the Commissioner revised the original plan of rehabilitation in several respects, although the

policyholders' option to accept restructured policies or to opt out of the rehabilitation was retained. The restructured policies included a reduction in benefits if a restructured policy is cashed in during a five-year moratorium period.

The new plan faced potential challenges as each group of contract holders sought an advantage. Seeking to eliminate a potential source of conflict regarding the plan as modified, Aurora offered improvements. These consisted of: (1) Aurora's agreement to transfer to policyholders all appreciation above the contract price for specified "base assets" ($162 million at the time the plan was approved); (2) Aurora's agreement to pay an additional amount for the benefit of structured settlement annuitants because of the special hardship they had suffered by reason of ELIC's insolvency; (3) the offer to policyholders of a voice in management of trusts established to liquidate assets retained by ELIC; and (4) Aurora's offer to uncovered policyholders (holders of annual premium whole-life contracts whose benefits were not fully guaranteed by the state guaranty associations) of additional benefits if they accepted the plan and received restructured policies. These additional benefits consisted of an "enhancement" of their accounts payable by Aurora in the amount of 1.4354 percent of their uncovered claim value. The total value of this enhancement was estimated at $374 million if all the potential recipients of restructured policies opted in.

The purpose of the offer was "to facilitate the Closing, to save the time and expense associated with continued litigation, to eliminate the risks associated with continued litigation and to encourage Contract Holders not to Opt Out . . . ." All of the parties except appellants Commercial National and the Albertsons agreed to the modified plan embodying the terms of a "rehabilitation agreement" incorporating the enhancements.

B. *Contentions*

Despite trial court findings based on substantial evidence that: (1) the enhancements will not be funded out of assets of the ELIC estate; and (2) the enhancements represented "new money" added to what Aurora was obligated to pay after it had won the bidding for ELIC, appellants claim that these enhancements must be added to the value of the insolvency estate so that they receive a ratable share even if they opt out. Once again this contention flies in the face of the standard of review.

Appellants, consisting of some but not all of the holders of pre-1989 Muni-GICs, add the claim that the modified plan discriminates against them because the restructured policies they will receive will constitute contracts of

class 6 priority if the successor insurer to ELIC should become insolvent. The Albertson appellants claim that the consent of Action Network for Victims of Executive Life (ANVEL), which represented them, was coerced, and that they were denied a fair hearing. As we explain below, all of these contentions lack substance.

## C. *The Restructuring Enhancement*

 Relying upon language in our opinion in *Commercial National Bank*, appellants assert that the plan of distribution discriminates against opt-outs because the liquidation value used in determining the total amount which is the basis for valuing the individual claims of the opt-outs is less than the amount which is the basis for the valuation of the claims of the opt-ins. This contention again takes the language of *Commercial National Bank* out of context.

In that case we held that the Commissioner and trial court had erred in valuing opt-out shares on the basis of the value of the assets of the insolvent insurer at the conservation date rather than the date of distribution. We said that to do so "breaches the Commissioner's fiduciary duty to distribute assets pro rata by relegating certain policyholders (opt-outs) to share a fund of lesser value than the fund to be shared by other policyholders (opt-ins) in the same creditor priority class." (*Commercial Nat. Bank* v. *Superior Court*, *supra*, 14 Cal.App.4th at p. 420.) We added, "There is no rational basis to penalize policyholders who are dissatisfied with the eventual plan on the theory that they are ungrateful dissidents who bore no risk of depreciation of the estate and deserve no share of the accumulations." (*Id.* at p. 421.)

In *Commercial National Bank* we were speaking to discrimination between opt-ins and opt-outs sharing in the same fund, a discrimination which resulted from the fund being more valuable at the time of distribution than it was on the conservation date. Here there is no question of the opt-ins and opt-outs sharing in the same fund. The source of the enhancement rests outside the insolvency estate. It represents money which Aurora is willing to pay to encourage settlement by contract holders who, if they opt in by accepting restructured policies, incur a detriment in the form of a moratorium on their ability to cash in their policies without penalty. There is no discrimination against opt-outs in the process. If opt-ins surrender their restructured policies during the first year (the period during which the opt-outs will receive the liquidation value of their claims), they will receive less than what the opt-outs receive.

Citing *In re Pacific Std. Life Ins. Co.* (1992) 9 Cal.App.4th 1197 [12 Cal.Rptr.2d 50], and *Estate of Gump* (1991) 1 Cal.App.4th 582 [2

Cal.Rptr.2d 269], appellants argue that the Commissioner cannot discharge his duties by giving preferential treatment to policyholders who assist him in avoiding judicial scrutiny. But this is not what will occur here. Aurora is supplying the enhancement from outside the insolvency estate. The Commissioner has no right to reach the enhancement funds without Aurora's consent and on Aurora's terms.

Appellants dispute this proposition by arguing that in substance Aurora was, by its offer, acquiring and paying for a book of business consisting of the restructured policies. Again this argument ignores the standard of review. Substantial evidence demonstrates that the restructuring allowance was not part of the insolvency estate. ELIC's book of business was valueless without restructuring. In fact, when the Michigan Commissioner of Insurance held an auction in an effort to sell ELIC's block of Michigan policies, the highest bid placed a negative value on them.

### D. *The Hardship Enhancement for Holders of Structured Settlement Annuities*

Appellants also contend that they are entitled to share in the "hardship" allowance granted by Aurora to the holders of ELIC structured settlement annuities. This contention fails. When the record is read as required by the standard of review, it is clear that for its own good reasons Aurora determined that it was to its advantage to have these annuitants agree to the modified plan. Conditioned as it was on settlement by this one class of claimants, the enhancement never became part of the insolvency estate.

### VI

### ASSERTIONS OF COERCION AND DURESS

### A. *Claim That Some Annuitants Were Coerced to Opt Out*

Appellants who are holders of pre-1989 Muni-GICs argue that they were forced to opt out because by accepting restructured policies they would risk loss of priority in the event of a future insolvency of the restructured company. This argument confuses choice with coercion. It ignores the fundamental teaching of *Carpenter* v. *Pacific Mut. Life Ins. Co* that the police power of the state exercised by the Commissioner as conservator permits modification of insurance contracts issued by an insolvent insurer. (10 Cal.2d at p. 329.) The holders of pre-1989 Muni-GICs were treated no differently than other ELIC policyholders in this regard. That they might in the future suffer some speculative detriment because of their own peculiar circumstances does not constitute invidious discrimination.

Indeed the modified plan here includes, as would any other rehabilitation plan, the mechanism by which a policyholder may account for his, her or its own peculiar circumstances. After weighing the benefits and risks, the policyholder may opt out. In that event the policyholder receives the liquidated value of his, her or its contract rights without unreasonable delay, a process expressly validated by *Carpenter*. (10 Cal.2d at p. 335; see also *Commercial Nat. Bank* v. *Superior Court, supra*, 14 Cal.App.4th at p. 404.)

B. *Claims of Coercion to Opt In*

To secure the benefits of Aurora's offer, the representative of each group of claimants was required to notify Aurora that all objections to the plan had been withdrawn and to agree not to challenge the plan. If a group representative accepted the terms of the agreement on behalf of the group and an individual policyholder in the group chose to reject the offer and continued to press objections, or appealed from approval of the plan, that particular policyholder but not the rest of the constituent group ceased to be eligible for settlement payment. Only ANVEL and the Commercial National group of Muni-GIC trustees objected.

ANVEL represented individual ELIC policyholders including the three, Mrs. Albertson and Mr. and Mrs. Fuchs, who constitute the Albertson appellants. Mrs. Albertson and Mr. Fuchs were members of ANVEL's steering committee. Prior to April 29, 1993, neither the Albertson appellants nor ANVEL was represented by counsel in these proceedings. From that date on ANVEL was represented by counsel. While ANVEL's formal status in the trial court was that of amicus curiae, its counsel was permitted the leeway of counsel for a party in argument and presentation of evidence.

On May 10, 1993, the Commissioner gave notice that hearing on the modified plan would commence on June 9, 1993. On June 1, 1993, ANVEL filed notice of its intent to appear, and on June 4 filed its trial brief. On June 7, by ex parte application, the Commissioner sought, among other items, approval of section 26.1 of the modified plan dealing with the Aurora enhancement offered to all policyholders who opted in. By its terms, section 26.1 of the agreement conditioned the enhancement upon the objector or deemed representative (including ANVEL) withdrawing objections to the modified plan by written agreement or notice by June 11, 1993.

Notified of the Commissioner's application, counsel for ANVEL on June 9 filed an ex parte application for immediate rejection of the settlement. At the June 9 hearing, the court granted ANVEL's request that it be permitted, without prejudice to the rights of its members, to articulate its objections to

the settlement. With that assurance, ANVEL withdrew its objections to the modified plan.

Counsel for ANVEL articulated five points of objection to the modified plan, and later presented evidence in the form of an actuary's declaration. The trial court invited interested policyholders to make presentations, and many did so, including Mrs. Albertson and Mr. Fuchs. The plan's proponents presented evidence responding to all objections and countering with expert testimony the declaration presented in support of ANVEL's position. ANVEL filed a posthearing memorandum further addressing the five points. The trial court rejected ANVEL's contentions and approved the modified plan. As permitted by section 26.1 of the agreement, incorporated in the modified plan, the three members of the Albertson group objected to the modified plan.

The Albertson appellants now claim that ANVEL was coerced into accepting the modified plan by the threat that unless ANVEL withdrew any objections to the modified plan within four days, its members would not participate in the Aurora enhancement. They claim also that they and ANVEL were denied the opportunity to be heard and to present evidence at the hearing to confirm the modified plan. The Underwriters claim that the policyholder elections were subject to economic duress.

There is a short answer to the Albertson claim of coercion of ANVEL. The Albertson appellants lack standing to raise it. ANVEL is not a party to this appeal, and the Albertson appellants are not aggrieved by the consent of ANVEL to the modified plan because, by the express terms of section 26.1, they were not bound by ANVEL's acceptance of the plan. They were free to, and did, object, addressed the trial court, and then opted out.

Nor on this record can the Albertson appellants complain that they were denied a fair opportunity to be heard. While they were still represented by ANVEL, the position advocated by the Albertson group was fully presented to the trial court. Mrs. Albertson and Mr. Fuchs were invited to, and did, participate. Any limit on their participation was self-imposed.

Underwriters' contention that the policyholders were subjected to economic duress by being forced to elect whether to opt in or opt out is similarly lacking in substance. They rely on *Rich & Whillock, Inc.* v. *Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1158 [204 Cal.Rptr. 86], which explains that the doctrine of economic duress "may come into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." That test is not met in this case.

Merely being put to a voluntary choice of perfectly legitimate alternatives is the antithesis of duress. It is irrelevant to duress that here one of the alternatives was made more attractive by payments offered by a party to a settlement that would not have been available absent the settlement to encourage other parties to participate. Encouragement is a far cry from coercion or denial of choice. (See *United States* v. *Washington* (1977) 431 U.S. 181, 187-188 [52 L.Ed.2d 238, 244-245, 97 S.Ct. 1814].)

As a last ditch argument, the Albertson appellants claim that the nature of the confirmation hearing on the modified plan denied them their First Amendment rights of speech and petition. They claim also that ANVEL was silenced by the enhancement provisions of the modified plan because of the diverse interests of the policyholders it represented.

We need address these claims only briefly. ■ First Amendment rights are not violated by reasonable time, place or manner restrictions. (See *Ward* v. *Rock Against Racism* (1989) 491 U.S. 781, 791 [105 L.Ed.2d 661, 675, 109 S.Ct. 2746]; *Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77, 84-86 [112 Cal.Rptr. 777, 520 P.2d 1].) There is a compelling public interest in keeping litigation within reasonable bounds so that it may be brought to an end after all parties have been afforded adequate opportunity to be heard. Indeed if this were not the case the restrictions of Evidence Code section 352 and parallel Federal Rules of Evidence, rule 403 barring unnecessary cumulative evidence would be unconstitutional. ■ The record here shows that the Albertson appellants were afforded the requisite opportunity.

As to ANVEL, it has not appealed, and the Albertson appellants lack standing to assert violation of its First Amendment rights, a violation clearly not demonstrated by this record for the same reasons which dictate rejection of the Albertson appellants' own claim.

## VII

### The NOLHGA Enhancement

Statutes in many states, including California (§§ 1067.01-1152)[7] allow associations of insurers to provide coverage up to statutory limits for policyholders of insolvent life and health insurers whose policies cannot be honored because of the insolvency. This coverage is funded by assessments up to a statutory maximum levied on insurer members of the state association. (§ 1067.08.) No coverage is afforded GICs or funding agreements.

---

[7]For convenience we refer to the California Insurance Code rather than comparable guaranty association statutes in other states in this portion of our discussion.

(§ 1067.02, subd. (b)(2).) NOLHGA is a national association of these state associations, formed, among other reasons, to coordinate the activities of the state associations in connection with large multistate insurer insolvencies such as that of ELIC.

Upon payment to a policyholder of an insolvent insurer, the guaranty association is subrogated to the rights of the policyholder (§ 1067.07, subd. (1)), and is deemed a creditor of the estate of the insolvent insurer to the extent of assets attributable to covered policies. (§ 1067.12.) The guaranty associations are entitled to early access to the insolvent insurer's assets. (§ 1035.5, subd. (a).)

When ELIC was placed in conservation, about $6 billion of its $10 billion liability to policyholders was covered by guaranty associations. About $4 billion of the $6 billion was represented by policies which were immediately surrenderable for cash surrender value. Absent a moratorium on the surrender of these policies, the ELIC estate faced a "meltdown" with consequent substantial losses both to the ELIC estate and the state guaranty associations.

An immediate demand of $4 billion on the guaranty associations would greatly have exceeded their annual assessment capacities. They would have been forced to exercise their early access rights to ELIC assets and to seek reduction of their obligations to policyholders. Immediate liquidation of ELIC's assets would have produced excessive losses to the insolvency estate, decreased benefits to ELIC policyholders, and brought delay in distributions. To avoid this potentially disastrous result and to resolve a controversy between the Commissioner and NOLHGA concerning measurement of subrogation rights, these parties entered into an enhancement agreement. This agreement settled the dispute between the participating guaranty associations and the Commissioner, and settled policyholder claims against the estate and the associations. In the settlement, the associations agreed to assign some of their subrogation rights to policyholders accepting the plan. The associations enhanced the value of restructured policies by approximately $2 billion. In so doing they agreed not to apply the California interest "roll-back" and the California coinsurance adjustment, which would have limited their liabilities.

Properly, because these enhancements derive from assets of the associations, not ELIC, and would not have been available absent the settlement, appellants do not claim the enhancements are discriminatory. ██ Underwriters, however, challenge the settlement as violating the provisions of the applicable state laws limiting policy guarantees, with a resulting violation on limits of the assessment power of the associations. They point

particularly to the California limitation to 80 percent of the covered benefits. (§ 1067.02, subd. (a).)

Underwriters lack standing to pursue this issue. Their interest in the estate is at best peripheral in that it rests on a preemptive strike seeking to reduce their potential liability to holders of Muni-GICs who have filed suit against them. The rights of the holders of Muni-GICs are not affected by the enhancement. Dog in the manger status is not standing.

## VIII

### COMMERCIAL NATIONAL BANK'S CLAIM TO INTEREST

In order to prevent a "run on the bank," the trial court stayed all payments to ELIC contract holders as of the conservation date, April 11, 1991. To mitigate hardships and at the same time preserve the value of ELIC's assets for a potential purchaser, the Commissioner sought authority to resume payment of benefits to certain policyholders. The trial court authorized the Commissioner to permit full payment of death and medical payments as well as 70 percent of periodic payments due and payable to certain retirement accounts, for structured settlement agreements, and for other single premium immediate annuities. Under the modified plan, these distributions will be deducted from the account values of the policyholders who received them. In addition, to compensate the estate for the loss of use of the funds, the distributees will be charged 3 percent interest, the short term interest rate earned by estate assets, from the time each interim payment was received until the closing.

Other similarly situated contract holders did not receive distributions. In obtaining two stays from the California Supreme Court against interim payments to Muni-GICs, the Commissioner argued that interim payments should not be made because the priority status of the Muni-GICs was in doubt. The Commissioner continued to deny payment to certain contract holders even after the Supreme Court denied review of our decision in *Texas Commerce*, which resolved the priority status of the pre-1989 Muni-GICs, and after our decision in *Commercial National Bank*, which disapproved discriminatory treatment of policyholders in the same class. Appellant Commercial National, the holder of pre-1989 Muni-GICs, did not receive a 70 percent distribution until September 1993.

Commercial National claims in this appeal that it is entitled to interest on the amount withheld, at least from the time of our decision in *Commercial National Bank*, the point at which its entitlement to interim

payments was beyond dispute. It argues that failure to pay this interest violates the requirement of pro rata distribution, in that the 3 percent interest rate charged against the distributee policyholders is not equivalent to the actual value of access to the funds. There is merit in this argument.

Respondents rely upon the general rule that while interest accrues on money obligations of an insolvent during the period of liquidation, "for the purpose of maintaining equality between creditors, no interest accruing during administration shall be paid to any creditor until the principal amount has been paid to every creditor. Thus in any case where the assets are insufficient to pay more than the principal amount of all claims, the first dividends to be paid will disregard interest and will be designated as payments of principal." (*McConnell* v. *Pacific Mutual Life Ins. Co.* (1962) 205 Cal.App.2d 469, 480 [24 Cal.Rptr. 5]; *In re Pacific Coast Bldg.-Loan Assn.* (1940) 15 Cal.2d 134, 147 [99 P.2d 251].)

But appellant's claim to interest is not based on the accrual of interest on the debt; it is based on the requirement of ratable distribution to all policy-holders within the same priority class. "[T]he Commissioner, as rehabilitator, is under a duty to collect assets and distribute them *ratably* as between claimants within the same section 1033 claim priority." (*Commercial Nat. Bank* v. *Superior Court, supra*, 14 Cal.App.4th at p. 420, original italics; see also *Allen* v. *Cal. Mutual B. & L. Assn.* (1943) 22 Cal.2d 474, 490 [139 P.2d 321].) As the United States Supreme Court explained in *Ticonic Bank* v. *Sprague* (1938) 303 U.S. 406, 411 [82 L.Ed. 926, 930, 58 S.Ct. 612], while interest accruing after a bank insolvency is generally not allowed, "interest is proper where the ideal of equality is served, and so a creditor whose claim has been erroneously disallowed is entitled on its allowance to interest on his dividends from the time a ratable amount was paid other creditors." Class 5 policyholders who received interim payments had the benefit of the use of that money. Class 5 policyholders denied interim payments were deprived of the use of that money. This is plainly inequitable absent a showing that the value of this use is no more than the 3 percent charged against the accounts of those ELIC claimants who received interim distributions. There is no such showing here.

Seven percent is the interest rate established by the California Constitution as the measure of compensation for the detention of money other than as provided in contract. (Cal. Const., art. XV, § 1; see also *McConnell* v. *Pacific Mutual Life Ins. Co., supra*, 205 Cal.App.2d 469, 481.) We accept that rate as the appropriate measure of the value of loss of use of interim payments, and correspondingly, as the appropriate measure of the benefit earned by policyholders who did receive interim payments. Under the

modified plan, policyholders who received interim payments will be charged 3 percent interest on those payments. Their benefit from the interim payments will be 7 percent, less that 3 percent charge, for a net benefit of 4 percent. Ratable distribution requires that appellant Commercial National be paid that same 4 percent interest on the interim payments it should have received from the date our decision in *Commercial National Bank* became final.

The Commissioner cites *Allen* v. *Cal. Mutual B. & L. Assn., supra,* 22 Cal.2d 474 for the proposition that under no theory is Commercial National entitled to recover interest as part of its claim. This contention credits *Allen* with deciding more than it did. *Allen* held only that interest did not accrue upon the claims against the insolvent estate there involved during the period that the priority of these claims was being adjudicated. The issue of the right to interest accruing after a contested claim of priority is finally adjudicated in the claimant's favor was neither tendered nor discussed in *Allen.* There was no reason to reach the issue because in *Allen* the claimants' rights to priority were not finally adjudicated until the Supreme Court spoke in the case.

*Allen* teaches that Commercial National was the subject of *proper* discrimination in the nature of denial of interest while its right to priority was being tested. *Allen* did not hold, and could not have held so long as it adhered to its requirement of "equality among creditors," (22 Cal.2d at p. 490) that after the right to priority of a claimant (here Commercial National) is established, there is no longer a rational basis for discrimination in the nature of failure of equality in the formula for distribution.

The Commissioner contends furhter that the 3 percent charged against recipients of interim distributions fully offsets Commercial National Bank's claim to interest. Two theories are espoused by the Commissioner in support of this contention: (1) Commercial National Bank's right to interest is measured by benefit to the estate; and (2) in any event, restrictions upon Commercial National Bank's investment of interim payments if they had been made would have its limited return to the short term rate of interest. The first of these theories lacks support in law while the second lacks support in the record.

The interest to which Commercial National Bank is entitled is based upon delay in payment of its claim for breach of contract, not on unjust enrichment of the estate. Hence the ordinary measure of damages is loss to the claimant and not gain to the estate. The Commissioner argues that the ordinary measure is inapplicable because part of the 3 percent interest

charged against the recipients of interim distributions inures to Commercial National Bank's benefit as a creditor, so as to result in ratable treatment. This argument ignores the fact that the distributees, at the cost of 3 percent, obtained the ability to invest at a greater rate for their individual benefit.

Citing section 4.10(a) of Commercial National Bank's indenture agreement relating to the relevant GICs, the Commissioner argues that the bank would have been required to invest any interim payments in short-term government securities bearing interest rates of no more than 3 percent. Our reading of section 4.10(a) of the indenture agreement does not support this argument. Section 4.10(a) deals with investment of funds destined for investment in ELIC GICs for any period in which the funds cannot be so invested. By the time interim payments became due to Commercial National Bank, ELIC was precluded from issuing further GICs because it was insolvent and in conservatorship.

## IX

### VALUATION OF OPT-OUT ACCOUNTS

Following the dictates of *Commercial Nat. Bank* v. *Superior Court, supra*, 14 Cal.App.4th 393, 419, the modified plan adopted by the Commissioner and approved by the trial court contained provisions for valuing opt-out accounts as of the date of the closing. In accordance with the long-settled rule that a dissenter is entitled to the equivalent of what he or she would receive on liquidation (*Carpenter* v. *Pacific Mut. Life Ins. Co., supra*, 10 Cal.2d at p. 335), the trial court tested the validity of these provisions by requiring that they produce no less than hypothetical liquidation value as of the closing and so found. The plan also provided that the opt-outs would receive their pro rata share of the proceeds of assets such as real estate to be held in trust for sale after the closing. In calculating liquidation value, the plan accounts for every asset of ELIC as of the closing date. These values are then allocated ratably among all policy holders in accord with each policy's CDSR.

The plan assumes that ELIC's remaining assets will be liquidated over a 12-month period and that the opt-outs will receive full distribution in 18 months. The plan estimates that incident to a total liquidation converting ELIC assets to cash there would have been expenses totaling $63 million. A portion of this amount, representing the opt-out's pro rata share of the liquidation expenses, was deducted in determining the liquidation value of each account. The plan includes a "hold-back" of 11.6 percent of the first

opt-out payments to provide for the contingency of further modification that might be required by pending appeals. Despite the assumption in the plan of a distribution in 18 months, the opt-outs will receive their payments as soon as their opt-out elections are processed.

■ Appellants contend that: (1) the computation of opt-out value fails to provide them with a ratable share of the insolvency estate; (2) the estimated liquidation costs will never be incurred; (3) there was no reason for the hold-back because no objection to the modified plan will affect appellants' recovery; and (4) the hold-back enables Aurora to earn an arbitrage profit at appellants' expense because interest payable on the amounts prepaid to the opt-outs is calculated at the short-term rate of approximately 3 percent while the estate will invest funds at higher rates. None of these contentions has merit.

Taking language out of context from our opinion in *Commercial National Bank*, appellants argue that the deduction for hypothetical liquidation costs is improper because the value of the aggregate of opt-in and opt-out shares must be distributed ratably among all contract holders. In *Commercial National Bank* we held that opt-out shares, like opt-in shares, must be valued at the date of distribution. In this connection we stated that relegating the opt-outs to a lesser fund breached the Commissioner's fiduciary duty. (14 Cal.App.4th at p. 420.) This statement was made in the context of the opt-outs' right to share in appreciation from the conservation date to the liquidation date. Nothing in our opinion in *Commercial National Bank* purports to overrule, distinguish, or criticize the Supreme Court's decision in *Carpenter* v. *Pacific Mut. Life Ins. Co.*, which squarely holds that "[a]ll the dissenter is entitled to is the equivalent of what he would receive on liquidation." (10 Cal.2d at p. 335.) Here the modified plan provides for just that.

It is fatuous to claim that liquidation of a portfolio of assets the size of that retained by ELIC would incur no expense. The portfolio would have to be managed over the period of liquidation. It is likely, if not inevitable, that commissions on sales would be payable. Because liquidation value is computed where there is no actual liquidation it is inevitable that expenses must be estimated. Here they were and appellants suggest no better estimate.

The plan's requirement of payment to opt-outs upon the processing of their statements of election required investment of the hold-backs in short term securities. Hence arbitrage was not involved.

X

## The Indemnification and Release Provisions of the Plan

### A. *Indemnification*

Section 17.17 of the modified plan limits to $300,000 a provision of the original bond sale agreement which obligated ELIC to indemnify Altus for losses and expenses relating to or arising from title defects or any other limitations affecting the transferred bonds. ▆▆▆ Texas Commerce asserts that section 17.17 violates the proposition that neither a trustee nor the recipient of the trustee's largesse can be indemnified by the trust estate against the consequences of the trustee's own wrongs.

In its respondent's brief Aurora (speaking for Altus) states that section 17.17 applies only as a limitation upon liability of ELIC for defects in title to the bonds. In its reply brief Texas Commerce concedes that if this is the construction to be given to section 17.17, its concerns are satisfied. We accept this concession and construe section 17.17 accordingly.

### B. *The Release Required of the Opt-outs*

The modified plan provides in section 1.128 that opt-outs must execute releases of "any and all rights, claims and offsets or the like (if any), []other than any right to have the value of their Opt Out rights determined on appeal . . . ." Nominal opt-outs who fail to execute the releases are deemed to have opted in.

▆▆▆ Appellants claim that this provision is a coerced waiver of rights from the opt-outs because its scope extends beyond that necessary to classi-fication of the rights of opt-ins and opt-outs. We need not reach the merit, if any, in this argument. Appellants have not demonstrated that they are aggrieved by section 1.128. Respondents have not asserted that section 1.128 in any way limits the right of appellants to raise the issues they have raised in this appeal, and appellants have not suggested in either their opening or reply briefs any rights foreclosed to them by the section. Any disposition of this issue would thus constitute no more than an advisory opinion. (See *Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132 [41 Cal.Rptr. 468, 396 P.2d 924].)

## XI

### PROFESSIONAL FEES

#### A. *Attorney Fees Included in the Near Global Settlements*

Appellants claim that provisions in the settlement agreements for payment of attorney fees of various settling parties were improperly approved by the trial court because the fees were either unreasonable or not supported by statute. This contention can be answered briefly. The amounts in the settlements characterized as attorney fees were simply part of the settlement package. They were of no greater consequence than would have been a provision for cash payment. So long as the settlements overall were reasonable and to the benefit of the insolvency estate, the trial court acted well within its discretion in approving them.

The portion of the matrix of settlements dealing with the grant of class 5 priority to the post-1988 Muni-GICs aside, appellants have failed to demonstrate that these settlements were unreasonable or lacked benefit to the estate. It follows that, as to these settlements, the appellants have failed in their burden. We have concluded that the trial court's approval of the settlement with the post-1988 Muni-GICs must be set aside, and the grant of attorney fees in this particular settlement falls along with its substance.

#### B. *Professional Fees Paid From the Estate*

More than $60 million in fees to attorneys and other professionals for services rendered to the estate were approved by the court. Appellant Commercial National contends that the trial court erred in the process it employed in discharging its statutory duty to approve these fees.

At oral argument, the Commissioner asserted for the first time that this court was without jurisdiction to review this issue because the orders approving payment of professional fees were final orders on collateral matters directing the immediate payment of money, and hence were separately appealable. Appellant having failed to seek review within 60 days of each order, the Commissioner claims no appeal can now be taken.

This reasoning has been rejected in the analogous context of receivership in a line of cases beginning in 1901. In *Free Gold Mining Co.* v. *Spiers* (1901) 135 Cal. 130 [67 P. 61], a receiver was ordered to purchase and install certain mining plants, and to pay for the purchase and installation from receivership funds. The Supreme Court held that this order could not be

reviewed until after final judgment, and that it was not the "exceptional" case in which the order constituted a final judgment upon a collateral matter arising out of the action. The court explained: "It is eminently proper for a receiver to apply to the court by which he was appointed for instruction and authority from time to time as he may need it . . . . [I]f every order which the court might make for the preservation or proper management of the property in its custody is subject to a direct appeal therefrom, not only would the court be greatly hampered in its efforts to preserve the property, but the interests of all the parties interested might be greatly prejudiced." (*Id.* at pp. 131-132.)

This reasoning was reaffirmed in *Title Ins. & Trust Co.* v. *Calif. etc. Co.* (1911) 159 Cal. 484 [114 P. 838], in which the court observed that the issue, properly resolved in *Free Gold Mining* "is to some extent one of convenience and policy. Where a court has taken possession and control of property through a receiver, the preservation and proper management of such property can best be effected by permitting the trial court, pending a final hearing of the cause, to direct the receiver in the disposition of the funds coming into his hands, without having its supervisory action subject to the delay and inconvenience incident to repeated and successive appeals from separate orders." (*Id.* at p. 492; see also *Schwartz* v. *Schwartz* (1970) 5 Cal.App.3d 133, 138 [85 Cal.Rptr. 45].) These cases are reasonable, persuasive, and consistent with the Supreme Court's concern that the "one final judgment rule" not be relaxed. (See *Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 738, fn. 4 [872 P.2d 143].) Accordingly, we find no jurisdictional obstacle to reviewing the orders approving payment of professional fees, and turn to the merits of the contention.

Over objection of Commercial National, the trial court adopted the process by which it reviewed for approval the Commissioner's payment of fees for lawyers and other professionals retained by the ELIC estate. The process involved an initial approval on ex parte application by the Commissioner, subject to later confirmation by the trial court triggered by the Commissioner's motions for instructions. The process was a continuing one which dealt with a vast number of fee requests, eventually resulting in trial court approval of approximately $60 million in professional fees.

Commercial National contends that the trial court erred in the process it employed in approving these fees. It claims in its opening brief that because the Commissioner's applications to the trial court lacked detail and failed to specify the time spent by individual professionals, the trial court lacked an adequate basis to approve the Commissioner's applications. It claims in its reply brief that it was denied a fair opportunity to be heard on its objections

to fees because the detail supporting the fees was not made available to it. We conclude that these contentions should be rejected.

The power of the Commissioner to employ professionals and to pay them for their services is found in section 1064.2, subdivision (c). A related power, exercised through the Attorney General, is to be found in section 1036. Both sections require "approval" by the trial court of fees which the Commissioner proposes to pay.

■ "Approval," as opposed to the "award" language more common in fee-shifting statutes, connotes an initial discretion in the Commissioner to determine whether fees billed are proper. The Commissioner is the public officer designated as the steward for the funds of the insolvent insurer whose estate he or she administers. The Commissioner's initial determination necessarily requires adequately detailed information describing the work performed, by whom it was performed, the time spent and when it was spent, and the rate and amount billed, unless an approved contract of employment specifies a different basis of compensation. (See, e.g., *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 48-49 [141 Cal.Rptr. 315, 569 P.2d 1303] [noting the starting point for determining just compensation of attorneys is a careful compilation of the time spent and reasonable hourly compensation for each individual involved in the case].) The Commissioner should possess sufficient information to be able to determine from the billings any excessive or duplicative charges, and seek clarification and correction where appropriate. Where compensation is on other than an hourly basis, the Commissioner must possess adequate information to determine that the terms of the engagement were satisfied.

■ To obtain court approval for payment of the fees deemed appropriate, the Commissioner must supply the court with adequate information to permit intelligent evaluation of the basis for the Commissioner's determination. The court must be satisfied that the Commissioner has performed his duty to protect the interests of the estate. It is not required by statute, nor is it practical, for the court to undertake a detailed review of the invoices before approving payment. The Commissioner must, however, be ready to provide whatever documentation the court may find necessary in determining the propriety of the Commissioner's request that payment be approved.

■ These standards were met in this case. The Commissioner's motions for approval of fees were accompanied by declarations from employees of ELIC or from the Commissioner's special counsel. These declarations recite that "extremely detailed" invoices seeking payment for legal or other professional services were received and carefully reviewed in their detail by

the Commissioner's staff. They recite that the proposed payments to the professional firms "are reasonable and necessary for the rehabilitation" and are in the best interests of ELIC. Also attached to the motions were brief descriptions of the services performed by each of the professionals seeking payment.

The court had other substantial evidence that supplemented and corroborated these declarations. At the court's request, the Commissioner supplied under seal for the court's inspection a sample of original invoices from its lead counsel, Rubinstein & Perry, thus permitting the court to test the accuracy of the declarations based upon them. These invoices cover the months of March, May and July, 1992. They include a description of the tasks performed, the time spent, and the amount billed for each attorney or legal assistant for each day. These invoices, which appear to be representative of the billing practices utilized in this case, provide a substantial basis for the court to believe the Commissioner was receiving adequate information upon which to exercise his discretion regarding payment to professionals for services rendered.

The Commissioner retained EAB Associates for the purpose of providing financial, accounting and litigation support services to ELIC. This firm utilized its own employees and subcontracted with other firms and consultants from the beginning of the conservancy proceedings. A declaration by the owner of EAB Associates describes the detailed timekeeping required of these individuals, the supervision of that timekeeping, the approval procedure utilized by the Commissioner's counsel, and a description of the types of services provided, the time spent, and the total hours billed from April 1991 through September 1992.

During the course of this litigation, specific allegations of overbilling by the Commissioner's lead counsel were brought to the attention of the parties and the court. The Commissioner employed an independent auditor to investigate these claims and to conduct additional analysis of the firm's practices. The investigation covered the period from April 1991 through November 1992. While the auditor criticized certain billing practices, including the lack of precision in timekeeping, he also noted that many of these practices were common among law firms. The allegations of overbilling were not substantiated. The auditor made some recommendations for prospective changes in the manner of billing, but also noted: "It is apparent from my review of the files that the Department [of Insurance] was closely monitoring the fees and regularly sought clarification and adjustments regarding items on the bills."

From all of this, the trial court had a sufficient basis to conclude that the Commissioner properly exercised his discretion in overseeing the professional fees incurred by the estate. Its approval of payments to these professionals was not an abuse of discretion.

We reject Commercial National's claim that it was denied a fair opportunity to be heard on its objections because it did not have access to detailed billing information. First, the claim is raised for the first time in a reply brief. (See *West* v. *Henderson* (1991) 227 Cal.App.3d 1578, 1585, fn. 5 [278 Cal.Rptr. 570].) Second, the lack of detailed documentation in open court was based on the trial court's acceptance of the Commissioner's claims of attorney-client and trade secret privileges and Commissioner's counsel's claim of the work-product bar. Commercial National does not challenge these rulings.

While we reject Commercial National's contention for the reasons stated, we are fully cognizant that the obligation to protect the grave public interest in insurer conservatorships is that of the courts as well as the Commissioner. We are, however, satisfied from the record that the Commissioner and the trial court adequately met their obligations to the public regarding the retention and payment of professionals on behalf of the estate.

### Disposition

The judgment is reversed in two respects. First, as to the approval of the settlement with the post-1988 Muni-GICs including any attorney fee provision related to that settlement, and second, as to the denial of interest to appellant Commercial National on interim payments it did not receive after our decision in Commercial National Bank became final. The cause is remanded for further proceedings on those issues consistent with the views expressed in this opinion. In all other respects, the judgment is affirmed. Each party is to bear its own costs on appeal.

Woods (A. M.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied March 15, 1995, and the opinion was modified to read as printed above. The petitions of all respondents and appellants for review by the Supreme Court were denied May 11, 1995.